## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EMINENCE FUND LONG MASTER, LTD.; EMINENCE FUND MASTER, LTD.; EMINENCE FUND II MASTER, LP; EMINENCE PARTNERS LONG II, LP; EMINENCE FUND LEVERAGED MASTER, LTD.; EMINENCE PARTNERS, L.P.; and EMINENCE PARTNERS II, L.P., <br><br> Plaintiffs, <br><br> vs. <br><br> PEGASYSTEMS INC., ALAN TREFLER and KENNETH STILLWELL, <br><br> Defendants. | No. 1:24-cv-12999 <br><br> **COMPLAINT** <br><br><br> **DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ......................................................................................................4

II.    JURISDICTION AND VENUE ...............................................................................12

III.   PARTIES..................................................................................................................13

    A.   Plaintiff ......................................................................................................13

    B.   Defendants..................................................................................................14

IV.   DEFENDANTS' FRAUDULENT SCHEME ...........................................................15

    A.   Pega Willfully and Maliciously Misappropriated Appian's Trade Secrets and Confidential Information ................................................................15

        1.   Pega Covertly Hires an Outside "Spy" as Part of "Project Crush"....................15

        2.   Pega's Senior Executives Orchestrated "Project Crush" ...................................23

        3.   Beginning in 2019, Pega's Senior Executives Directed Another "Teardown" of Appian's Platform ...........................................................................28

        4.   Pega's Employees Used Fake Names, Fake Companies, and Corporate Fronts to Execute the Teardown..........................................................................32

        5.   Pega's Officers, Senior Executives, and Other Employees Received and Maintained Access to Appian's Misappropriated Information .........................37

    B.   Pega Conceals from Investors its Scheme to Misappropriate Appian's Trade Secrets, its Resulting Potential Liability, and Appian's Ultimate Lawsuit Alleging Egregious Misconduct Involving Pega's Senior Executives.........39

    C.   Pega Discloses the Virginia Action on the Eve of Trial in February 2022, While Misleadingly Assuring Investors Appian's Claims Lack Merit and Any Claims for Damages Are Unsupported ..........................................................41

    D.   Following a Seven-Week Trial, a Jury Awards Appian over $2 Billion in Damages ....42

    E.   The SEC Investigates .........................................................................................44

    F.   The Securities Class Action Settles..................................................................44

V.   MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..............45

    A.   Misstatements and Omissions Regarding Pega's Competition and Sales and Marketing Practices in the BPM Market ...........................................................46

B.    Misstatements and Omissions Regarding Pega's and its Competitors' Intellectual Property ....................................................................................................52

C.    Misstatements and Omissions Regarding the Virginia Action and Appian's Claims Against Pega...........................................................................................56

D.    Misstatements and Omissions Regarding Pega's Code and Compliance with Ethical and Legal Guidelines ...............................................................................60

E.    False and Misleading Sarbanes-Oxley Certifications ....................................64

VI.    PEGA'S FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED IN VIOLATION OF GAAP AND SEC DISCLOSURE RULES ............................................................65

A.    Defendants Failed to Disclose Loss Contingencies and Legal Proceedings in Violation of GAAP and SEC Disclosure Rules.......................................................65

1.    Item 103: Legal Proceedings..............................................................67

2.    ASC 450: Disclosure of Loss Contingencies ....................................73

VII.    ADDITIONAL SCIENTER ALLEGATIONS ................................................................78

A.    Defendants Intentionally Concealed from Investors Evidence of Defendants' Scheme to Misappropriate Appian's Trade Secrets .........................................78

B.    Defendants Admitted Their Scheme to Misappropriate Appian's Trade Secrets Was Inappropriate ........................................................................................84

C.    Defendants Were Motivated to Conceal from the Public the Comprehensive Injunctive Relief Appian Sought .....................................................................87

D.    Defendants Intentionally Concealed from Investors Evidence of Pega's Parallel Misconduct Involving Other Software Companies .............................88

E.    Defendants' Scheme Involved a Primary Competitor of Pega's...................90

VIII.    LOSS CAUSATION ........................................................................................................92

IX.    PLAINTIFFS' ACTUAL RELIANCE ............................................................................96

X.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE.......................................97

XI.    CAUSES OF ACTION ....................................................................................................98

XII.    REQUEST FOR RELIEF ..............................................................................................107

XIII.    JURY DEMAND ...........................................................................................................107

## FACTS COMMON TO ALL COUNTS

Eminence Fund Long Master, Ltd.; Eminence Fund Master, Ltd.; Eminence Fund II Master, LP; Eminence Partners Long II, LP; Eminence Fund Leveraged Master, Ltd.; Eminence Partners, L.P.; Eminence Partners II, L.P. (collectively, "Plaintiffs" or the "Eminence Funds" and, together with non-party Eminence Capital, LP, "Eminence"), by and through the undersigned counsel, bring this action against Pegasystems Inc. ("Pegasystems," "Pega," or the "Company"), Alan Trefler ("Trefler"), and Kenneth Stillwell ("Stillwell") (Pega, Trefler and Stillwell, collectively, "Defendants") upon personal knowledge as to those allegations concerning Eminence and, as to all other matters, upon the investigation of counsel, which included, without limitation, the review and analysis of: (a) public filings made by Defendants and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) releases and other publications disseminated by Defendants; (c) securities analyst reports, news articles, websites, and other publicly available information concerning Defendants and non-parties; (d) filings and other documents relating to the action *Appian Corporation v. Pegasystems Inc., et al.*, Civil Action No. 2020-07216 (Circuit Court of Fairfax County, Virginia) (the "Virginia Action") and related appeals; and (e) pleadings, motion papers, and exhibits to declarations filed in the matter *In re Pegasystems Inc. Securities Litigation*, No. 1:22-cv-11220-WGY (D. Mass.) (the "Securities Class Action" or the "Class Action"). Plaintiff believes that substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    Pega and its most senior executives engaged in a systematic, willful, and malicious scheme to misappropriate and profit from the trade secrets and confidential information of its primary competitor, Appian Corporation ("Appian"). Defendants concealed their scheme, the massive potential liabilities it created, and its impact on Pega's natural ability to compete with

Appian from investors during the Relevant Period.

2.      Pega's concealment artificially inflated the price of its common stock in at least three ways. First, by hiding the extreme extent to which Pega's competitiveness relied on misappropriation of competitors' trade secrets and confidential information, Pega gave investors the misimpression that its business was driven by its own innovation and competitive advantage in the marketplace, thereby inflating the price of Pega's stock compared to a price that recognized Pega's misappropriation-focused business model was not sustainable. Second, by hiding the massive exposure to potential legal liabilities associated with Pega's misappropriation scheme, Pega severely understated to investors the Company's risk of losses resulting from legal judgments, fines, or penalties against it (and associated legal fees), thereby inflating the price of Pega's stock compared to a price that recognized the true level of risk. Third, likewise, by concealing the importance of the Virginia Action, Pega understated the risk of a substantial judgment against it in that suit, as well as collateral consequences thereof, thereby inflating the price of Pega's stock compared to a price that recognized the true level of risk.

3.      Plaintiffs purchased tens of millions of dollars of Pega common stock between June 16, 2020 and September 19, 2022, inclusive (the "Relevant Period"). When the truth of Pega's trade secret appropriation was revealed, the concealed risk materialized, Pega common stock suffered massive declines and Plaintiffs suffered tens of millions of dollars in damages.

4.      Plaintiffs bring this suit against Pega, Trefler (PEGA's CEO), and Stillwell (Pega's CFO), arising out of Plaintiffs' purchases of Pega common stock – at inflated prices due to Defendants' unlawful concealment of material information – during Relevant Period and resulting losses when the truth was revealed.

5.      Pega operates in the intensely competitive Business Process Management ("BPM")

industry, providing a "low-code" development platform that allows customers to build customized workflow-based applications for their business needs. Appian competes in the same industry as Pega and is one of its primary competitors.

6.    Pega commenced its scheme against Appian in early 2012 with "Project Crush," an operation that involved recruiting an experienced Appian developer who was willing to misappropriate Appian's trade secrets for Pega. Pega hired outside third party KForce Inc. ("KForce") to identify candidates for Pega to recruit, emphasizing to KForce the potential candidate *could not be "loyal" to Appian.* PLT 4.[1] In February 2012, KForce introduced Pega to Youyong Zou ("Zou"). For years Zou worked for U.S. government contractors utilizing Appian's platform to build software applications. Zou's employment with government contractors provided Zou with access to the Appian software and documentation that Pega coveted.

7.    From approximately February 2012 to September 2014, Zou collaborated extensively with Pega, by using his Appian credentials to access Appian's trade secrets and sell them to Pega. Pega in turn funneled payments to Zou through KForce, the middleman entity. Pega also employed several measures to conceal its improper operation, including assigning Zou the pseudonym "Matt *(so that he isn't 'outed' as our spy)*."[2] PLT 377.

8.    Zou's undertaking for Pega included creating extensive video footage of Appian's platform, covertly downloading for Pega large volumes of Appian's confidential documentation, showcasing for Pega the functionality of the Appian platform, providing Pega with valuable insight into Appian's software, showing Pega how to use and navigate Appian's platform, and answering Pega's detailed technical questions about Appian's software. Zou also met and collaborated with

---

[1] References to "PLT," "PLTD," "Depo. Tr.," and "Trial Tr." herein are to exhibits and/or transcripts in the Viriginia Action. Emphasis is added throughout.
[2] Pega coined Zou's pseudonym – "Matt" or "the other Matt" – after Matt Calkins, Appian's founder and Chief Executive Officer ("CEO").

several of Pega's officers, senior executives, engineers, and managers as part of Project Crush.

9.      Having acquired Appian's misappropriated trade secrets and confidential information, Pega used them to, inter alia, develop invaluable sales and intelligence materials, train Pega's salesforce to effectively compete against Appian, win customers and deals over which Pega and Appian directly competed, and make improvements to Pega's own software. Pega disseminated Appian's misappropriated information to hundreds of Pega employees, extolling its importance and promising that – with the benefit of Zou's information – *Pega "will win EVERYTIME"* and *"should never lose against Appian!"* PLT 721; PLT 196. Pega used the highly valuable information it obtained from Zou for many years – up until *at least 2020*.

10.     Pega's top executives were in on the scheme. Trefler – Pega's CEO, founder, and Chairman of the Board of Directors – personally met with Zou at Pega's corporate headquarters, reviewed information Zou had misappropriated for Pega, and employed that information to "blow . . . up" Appian's deals. PLT 227. Several other senior executives – including Pega's Chief Product Officer ("CPO") (Kerim Akgonul ("Akgonul")), Chief Technology Officer ("CTO") (Don Schuerman ("Schuerman")), Chief of Clients and Markets ("CMM") (Leon Trefler, Defendant Trefler's brother), and Head of Product Marketing (Douglas Kim ("Kim")) – also participated in Project Crush. As one of the two whistleblowers who alerted Appian to Pega's scheme in 2020 later testified, "*Alan Trefler [and] all of these people obviously knew we were doing this.*" 9/20/21 Bearden Depo. Tr. at 246.

11.     Project Crush was a raging success, and Pega's appetite for Appian's trade secrets proved insatiable. Accordingly, by 2019, Pega was already charting a course for another "teardown" of Appian's software. Defendant Trefler personally directed this latest "teardown," which Pega carried out through an array of subterfuge and illicit tactics. Instead of recruiting

another Appian developer, Pega used fake names, and fake or front companies, to illicitly gain access to Appian's trade secrets. One employee concocted multiple "personas," including ones named "Andrew Powers" and "Emily Gold," and a fake consulting firm ("Andrew Powers Consulting"), to infiltrate Appian's platform. Other employees falsely posed to Appian as "customers," using their spouses' businesses as corporate fronts to obtain access to Appian's software. Pega persisted in its scheme despite explicit concerns internally over the "***legality" of Pega's actions***. PLT 643-A.

12.    Defendant Trefler even ***misrepresented his own identity*** in his mission to "make[] [Appian] go away for good" (1/10/22 Baril Depo. Tr. at 238) employing several aliases (including "Albert Scii," "A. Ewe," and "Paul Foon") to access Appian's information.

13.    In early 2020, Appian caught wind of Pega's scheme from two whistleblowers, both former Pega employees. Shortly after discovering Pega's scheme, Appian filed the Virginia Action on May 29, 2020.

14.    The Virginia Action featured damning allegations against the Company and Zou. According to Appian's complaint, filed on May 29, 2020 ("May 2020 Complaint"), ***"as recently as [2019],"*** Pega had engaged in "unlawful schemes . . . [that] involved stealing Appian's trade secrets and confidential information and then using them to damage Appian's business and reputation, and to steal Appian's customers and potential customers." Appian alleged Pega's scheme "[i]nvolv[ed] personnel at Pegasystems ***up to and including Pegasystems' CEO and Founder, Alan Trefler, and other high-ranking Pegasystems executives.***"

15.    Appian's six-count complaint sought various relief against Pega, including actual losses, unjust enrichment including a disgorgement of Pega's profits, attorney's fees, costs, punitive damages, treble damages, and sweeping injunctive relief.

16.     Despite Appian's damning and well-supported allegations that Pega, its CEO and Chairman, and other officers had coordinated a multi-year espionage operation against Appian, and the astounding financial and reputational damage Pega faced from the litigation, ***Defendants failed to disclose the Virginia Action for the first 18 months of the Relevant Period***. During that time, Pega misleadingly assured investors that litigation from unnamed competitors could arise at some indeterminate point in the future. Pega also misleadingly indicated to investors that Pega prohibited the very tactics it secretly employed against Appian, including, inter alia, using "***illegal or questionable means to acquire a competitor's trade secrets or other confidential information***, such as . . . ***misrepresenting your identity in hopes of obtaining confidential information.***" Defendants also misleadingly reassured investors of Trefler's responsibilities in providing "guidance as to the propriety" of his employees' actions.

17.     Yet, at the time Defendants made these and other misstatements to the contrary, unbeknownst to investors, Pega had (i) ***already*** employed "questionable" tactics for years – surreptitiously building its business through corporate espionage rather on market competitiveness – and was (ii) ***already*** ensnared in potentially ruinous litigation as a result. Moreover, Defendants failed to disclose that Defendant Trefler – Pega's purported moral compass – was himself an active participant in, and stood behind, the very misconduct that flouted Pega's ethics code and allegedly violated the law. These were not risks nor speculative possibilities, they were actions Pega and its top executives had already taken, with only the fallout from those actions to be determined.

18.     Defendants' statements and omissions alleged herein violated the securities laws, SEC regulations, and Generally Accepted Accounting Principles ("GAAP"), including SEC Regulation S-K Item 103 ("Item 103") and Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 450, *Contingencies* ("ASC 450"), as well as

the common law.

19.     While Defendants concealed their misconduct and the Virginia Action from investors, Pega rushed to eliminate the Virginia Action as quickly and quietly as possible. Pega's tactics included concealing damning evidence of its misconduct, filing motions to stay or restrict discovery, filing motions to compel *non-public* arbitration of Pega's conduct, verifying misleading interrogatory responses, falsely testifying during depositions, and altering Pega's internal documents. The court in the Virginia Action did not countenance these maneuvers; Pega's losses piled up and its efforts to dispel the Virginia Action proved unsuccessful. But these actions were part of an overall scheme to mislead investors as to Pega's actions, the sustainability of its business model, and the liability it faced for its prior bad act.

20.     On February 16, 2022, nearly two years after the Virginia Action was filed and with a merits trial around the corner, Pega finally publicly disclosed the existence of the Virginia Action in an SEC filing, including that Appian sought up to $3 billion in damages (representing all of Pega's revenue, less its direct costs, from the fourth quarter of 2013 ("4Q13") to the third quarter of 2021 ("3Q21")), and that Pega faced liability under the Virginia Uniform Trade Secrets Act ("VUTSA") and the Virginia Computer Crimes Act ("VCCA").

21.     Defendants' SEC filing concealed material details of Pega's egregious scheme, while misleadingly assuring investors that Appian's claims "***are without merit***," Pega has "***strong defenses to these claims***," and "***any alleged damages claimed by Appian are not supported.***" In truth, Appian's claims had tremendous merit: as Defendants knew or recklessly disregarded, for years Pega had engaged in willful and malicious conduct aimed at misappropriating Appian's information and using it to benefit Pega. Trefler's cadre of executives were themselves participants in the scheme and had fully supported Trefler's mission to "destroy[] Appian." 1/10/22 Baril Depo.

Tr. at 238-39. Meanwhile, Pega's purportedly "strong defenses" had been proven hollow, as the case steadily marched towards trial.

22.     Appian's potential damages were also real liabilities. Presented with overwhelming evidence that Pega used Appian's trade secrets to improve Pega's software, and ***despite facing over $3 billion in claimed damages***, Pega's own expert "***accept[ed] the premise that all of [Pega's] sales [from 4Q13 to 3Q21]" were tainted by misappropriation***. 5/3/22 Trial Tr. at 7508. Pega's expert also conceded that Appian's damages from the 201 opportunities for which Appian and Pega directly competed from 4Q13 to 3Q21 were upwards of ***$187 million*** if Pega was found liable for misappropriation.

23.     On May 9, 2022, following a seven-week jury trial, the jury unanimously decided in favor of Appian, finding Pega and Zou had misappropriated Appian's trade secrets in violation of the VUTSA and violate the VCCA.

24.     The jury also found Pega acted willfully and maliciously in misappropriating Appian's information, entitling Appian to seek ***tens of millions in attorney's fees and costs***.[3]

25.     Pega's stock price sank 20.75% ($13.68 per share) on May 10, 2022, as news of the verdict began to ripple through the market. One analyst acknowledged the verdict's "reputational harm to Pegasystems," which could cause customers to "***shift[] PEGA resources over to Appian's platform.***" Another analyst remarked the verdict "***will be a blot on Pega's record when dealing with federal contracts as the company will likely have to disclose its violation of the Virginia Computer Crimes Act.***"

26.     Pega's stock price dropped another 8.00% ($4.18 per share) on May 11, 2022, as

---

[3] According to the jury instructions delivered in the Virigina Action: "Willful conduct occurs when a party acts without regards for the rights of another, knowing injury will probably follow. Malicious conduct occurs when a party acts with ill will or spite."

analysts slashed their price targets of Pega in the wake of the verdict. Morgan Stanley cited "***the damage to Pegasystems' record***," while Morningstar noted "the heightened risk" to Pega's business. Another analyst reduced its price target due to "***potential ACV [Annual Contract Value] growth headwinds as a result of the lawsuit decision***" and Appian's "***edge versus Pegasystems for future government contracts.***"[4]

27.     On September 16, 2022, Pega and Appian each separately disclosed that a final judgment had been entered in the Virginia Action, affirming the jury's verdict, including a finding of a violation of the VUTSA, finding that Pega had violated the VCCA, and its determination that Pega has acted willfully and maliciously. Pega's stock price swiftly dropped 5.93% ($2.39 per share) on September 16, 2022 and 5.99% ($2.27 per share) on September 19, 2022, as the market reacted to the news that the jury's May 9, 2022 verdict was not vacated, and as analyst estimates were slashed further over "uncertainty stemming from the lawsuit," "clients['] deci[sions] to re-evaluate their Pega investments," and the ruling's "impact . . . [on] [Pega's] federal business."

## II.    JURISDICTION AND VENUE

28.     Certain of the claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b- 5.

29.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, 28 U.S.C. §1367(a), and §27 of the 1934 Act, 15 U.S.C. §78aa.

30.     Venue is proper in this District pursuant to §27 of the 1934 Act, 15 U.S.C. §78aa,

---

[4] According to Pega, ACV "represents the annualized value of our active client contracts as of the measurement date," and is "the most important metric" at Pega.  For instance, Defendant Stillwell stated on February 17, 2021 that "growth in annual contract value remains the most important operational metric that reflects the underlying growth of our business," and stated on October 27, 2021 that "[w]hen it comes to our most important metric that we measure as our business success, ACV continues to be the most important metric."

and 28 U.S.C. §1391(b) because many of the acts and practices complained of herein occurred in substantial part in this District. Pega is a Massachusetts Corporation and its corporate headquarters are located in this District.

## III.   PARTIES

### A.   Plaintiff

31.    Plaintiff Eminence Fund Long Master, Ltd. is an exempted company incorporated under the laws of the Cayman Islands, who purchased and held (instead of selling) Pega common stock during the Relevant Period, and was damaged thereby. The dates on which this Plaintiff purchased Pega common stock during the relevant period are attached as Exhibit A.

32.    Plaintiff Eminence Fund Master, Ltd. is an exempted company incorporated under the laws of the Cayman Islands, who purchased and held (instead of selling) Pega common stock during the Relevant Period, and was damaged thereby. The dates on which this Plaintiff purchased Pega common stock during the relevant period are attached as Exhibit B.

33.    Plaintiff Eminence Fund II Master, LP is a limited partnership organized under the laws of the state of Delaware, who purchased and held (instead of selling) Pega common stock during the Relevant Period, and was damaged thereby. The dates on which this Plaintiff purchased Pega common stock during the relevant period are attached as Exhibit C.

34.    Plaintiff Eminence Partners Long II, LP is a limited partnership organized under the laws of the state of Delaware, who purchased and held (instead of selling) Pega common stock during the Relevant Period, and was damaged thereby. The dates on which this Plaintiff purchased Pega common stock during the relevant period are attached as Exhibit D.

35.    Plaintiff Eminence Fund Leveraged Master, Ltd. is an exempted company incorporated under the laws of the Cayman Islands, who purchased and held (instead of selling) Pega common stock during the Relevant Period, and was damaged thereby. The dates on which

this Plaintiff purchased Pega common stock during the relevant period are attached as Exhibit E.

36.     Plaintiff Eminence Partners, L.P. is a limited partnership organized under the laws of the state of New York who purchased and held (instead of selling) Pega common stock during the Relevant Period, and was damaged thereby. The dates on which this Plaintiff purchased Pega common stock during the relevant period are attached as Exhibit F.

37.     Plaintiff Eminence Partners II, L.P. is a limited partnership organized under the laws of the state of New York, who purchased and held (instead of selling) Pega common stock during the Relevant Period, and was damaged thereby. The dates on which this Plaintiff purchased Pega common stock during the relevant period are attached as Exhibit G.

38.     Plaintiffs' investment decisions, including decision to purchase, otherwise acquire, or hold (i.e., not sell) Pega common stock during the Relevant Period, were at all relevant times made by non-party Eminence Capital, LP ("Eminence Capital"). Eminence Capital had a consistent practice of reading Pega's securities filings, attending Pega's investor calls, and otherwise staying apprised of public statements made by Pega with respect to, *inter alia*, its business operations, practices, financial outlook, competitiveness, liabilities—including statements like those alleged herein.

**B.     Defendants**

39.     Defendant Pegasystems Inc. was incorporated in Massachusetts in 1983 and maintains its corporate headquarters in Cambridge, Massachusetts. During the Relevant Period, Pega traded on the NASDAQ Global Select Market under the ticker symbol "PEGA."

40.     Defendant Alan Trefler has served as Pega's CEO and Chairman of the Board of Directors of Pega since founding Pega in 1983. Trefler owns approximately 49% of Pega's outstanding common shares. Trefler held 49% or more of Pega's common shares during the Relevant Period, making him by far the largest single shareholder of the Company. Trefler's

enormous personal wealth tied into Pega's share price provided him a strong incentive to artificially inflate, maintain, and/or stabilize the Company's share price. On information and belief, Trefler resides in Norfolk County, Massachusetts.

41.     Defendant Kenneth Stillwell is Pega's Chief Financial Officer ("CFO") and Chief Operating Officer ("COO"). Stillwell joined Pega in July 2016 as Senior Vice President, CFO, and Chief Administrative Officer ("CAO"). In April 2021, Stillwell was promoted to COO in addition to his role as CFO. Stillwell is a Certified Public Accountant. On information and belief, Stillwell resides in Worcester County, Massachusetts.

42.     Defendants Trefler and Stillwell are at times referred to herein as the "Individual Defendants."

## IV.     DEFENDANTS' FRAUDULENT SCHEME

### A.     Pega Willfully and Maliciously Misappropriated Appian's Trade Secrets and Confidential Information

#### 1.     Pega Covertly Hires an Outside "Spy" as Part of "Project Crush"

43.     Pega operates in the intensely competitive BPM software market, providing a "low-code" development platform that allows customers to build applications targeted to their needs. According to Pega, "low-code" software allows customers to "configure and evolve" customized business applications without having to "write code." Analyst J.P. Morgan has similarly described "[l]ow-code (no-code) platforms" as "allow[ing] business users with minimal coding experience (citizen developers) to easily create workflow-based process-centric applications."

44.     According to Pega, its "target clients are Global 3000 organizations and government agencies," including companies in the financial services, life sciences, healthcare, communications and media, insurance, manufacturing, high tech, and consumer services industries.

15

45.     Founded in 1999, Appian competes in the same BPM industry as Pega, providing a low-code development platform for customers to quickly develop business applications. As analyst J.P. Morgan stated in August 2020, Appian's "strength lies in its low-code application development platform." Appian generates revenue by licensing its software to customers and business partners. An Appian license permits the licensee to develop custom, low-code applications using Appian's development environment and run them on Appian's platform. An Appian license also permits the licensee to access Appian's documentation, which describes the technical features of Appian's software platform, and techniques that can be used to build applications on Appian's platform.

46.     Defendants viewed Appian as a serious competitive threat and one of Pega's top competitors. Trefler harbored particular ire against Appian. As one Pega employee admitted internally on October 4, 2019, "Alan [Trefler] and [his brother] Leon [Trefler] are ***very focused on destroying Appian. Like making it go away for good***." PLT 649.

47.     Rather than compete fairly and lawfully against Appian, beginning as early as 2012, Pega secretly began misappropriating Appian's trade secrets and confidential information. Pega then weaponized the misappropriated information by using it to train its salesforce, create internal materials to deploy in "head-to-head" competitions against Appian, and improve Pega's own software.

48.     Appian adopted various measures and restrictions to protect its trade secrets from competitors like Pega. According to Appian, these measures included restricting access to its platform to licensed users, as well as utilizing terms of use, firewalls, multi-factor authentication with hardware tokens, encryption, user authentication, controls to restrict access to resources, password change requirements, monitoring email addresses of registrants, mechanisms to block

access from competitor email addresses, information security personnel, and security awareness training for Appian employees.

49.    Defendants also knew that Appian closely guarded its trade secrets. As one Pega employee testified during his 2022 deposition, "***it was a known thing that Appian . . . was very black box about giving out trials . . . [i]t was common [knowledge] that it's impossible to get an Appian trial***." 1/21/22 Davis Depo. Tr. at 169, 175. Another Pega employee (Mayran Snir Barak ("Barak"), Pega's Director of Data & Integration) complained in a November 14, 2017 internal chat message: "I can't get any sort of access to [A]ppian . . . we are not a 'qualified business' for the free trial." PLT 816. Pega employee Ben Baril ("Baril") (Director, Office of the CTO) echoed this sentiment in an October 1, 2019 email to Trefler, stating "Appian is ***very tightly controlled about who has access to their trial environments***." PLT 632. And on October 28, 2019, Baril emailed himself a copy of Appian's "Terms and Conditions" which prohibited, among other things, the "use" of Appian's service by "competitor[s]," as well as users "provid[ing] information about the [Appian] Cloud Offering to a competitor of Appian." PLT 665.

50.    Pega determined that if it was going to "destroy[] Appian," it needed someone with access to Appian's platform who was willing to sell Appian's closely guarded information. Accordingly, Pega hatched a plot to enlist a developer with access to Appian's platform.

51.    To identify such a developer without drawing attention to itself, Pega hired KForce in February 2012. Pega told KForce it needed "an Appian Developer" with "several years of experience working specifically with Appian," and that "***[a]ccess to the Appian BPM tool is a must.***" PLT 180. Pega emphasized to KForce that the developer "***should not have worked directly with Appian***" and ***could not be "loyal" to Appian*** because Pega did not want its scheme "***getting back to Appian.***" PLT 4; 7/28/21 Cerrito Depo. Tr. at 20-21.

52.     In February 2012, KForce introduced Pega to Zou. For years, Zou had worked for U.S. government contractors utilizing Appian's platform to build software applications. Zou's employment with government contractors such as Serco Inc. ("Serco") in 2012 to 2014 provided Zou access to Appian's closely-guarded software and documentation.[5]

53.     Zou fit the bill, and from around February 2012 to September 2014, Zou worked extensively with Pega to misappropriate Appian's trade secrets as part of "Project Crush."[6] During this time period, Zou (among other things): (i) created videos of himself accessing Appian's platform; (ii) covertly downloaded enormous volumes of Appian's software documentation for Pega; (iii) showcased for Pega the functionality of Appian's platform; (iv) supplied Pega with confidential information regarding the strengths and limitations of Appian's software; (v) demonstrated to Pega how to use and navigate Appian's platform; and (vi) answered Pega's detailed technical questions about Appian's platform.

54.     Zou also visited Pega's corporate headquarters in Cambridge, Massachusetts on multiple occasions. During such visits, Zou collaborated with Pega's executives, engineers, and other employees, used Pega resources to access Appian's platform, and presented to Pega information Zou had secretly obtained from Appian. For example, in advance of one such meeting at Pega's headquarters on January 29, 2013, John Petronio ("Petronio") (Pega's former Director of Product Marketing) informed Defendant Trefler, Leon Trefler (Pega's CCM), Schuerman (Pega's CTO), and other Pega employees that "***Youyong Zou . . . will give demonstrations of building an application in Appian 7 . . . [and] will be at Pega for the day.***" PLT 191.

_____

[5] For instance, Zou testified that "[d]uring the entire 2012 to 2014 time period that [Zou] worked as an Appian consultant for Pegasystems," Zou "use[d] [his] Serco laptop to do that work."  Trial Tr. at 4329:22-4240:6, 4240:13-23.

[6] Pega ended its arrangement with Zou in or about September 2014 after Zou "switched to another project" with his employer and, as a result, lost his access to Appian's platform. PLT 007.

55.     Pega found Zou's information incredibly useful. As one whistleblower testified in early 2022, Zou's information was "***hugely useful in that it gave us a level of insight . . . we didn't have before," it gave Pega "access to the black box.***" 9/20/21 Bearden Depo. Tr. at 34, 42. Leon Trefler also admitted the misappropriated information "was useful" and "assisted Pegasystems in its marketing efforts to compete against Appian." PLTD-010.20. Another Pega executive admitted the misappropriated information provided Pega "great ammunition to help [it] compete and win against [Appian]." 10/14/21 Van Wess Depo. Tr. at 183. Appian's misappropriated information was so useful that Pega ***widely circulated and utilized it across Pega's organization***, including (according to one count) to over 200 executives, salespersons, software engineers, product developers, and other employees.[7] Pega used the information it obtained from Zou for many years, ***until at least 2020***.

56.     Among the materials Pega amassed were dozens of hours of video footage of Zou accessing and working within Appian's platform.[8] Malcolm Ross ("Ross"), Appian's Vice President of Product Strategy and Deputy CTO, testified about such footage during the 2022 trial:

> Q. Now, during this trial, we've seen numerous videos of Mr. Zou developing the Appian software platform. Did you see those videos?
>
> A. Many videos.
> . . .
>
> Q.     In those videos, Mr. Zou was sharing his access to Appian software with Pegasystems, correct?
>
> A. In detail, yes.
>
> Q. And he was answering questions posed by Pegasystems' employees, correct?
>
> A. Yes, and they were directing him where to navigate.
> . . .

---

[7] This included Trefler, Leon Trefler (CCM and Head of Sales), Schuerman (CTO), and Akgonul (CPO).

[8] Pega ultimately amassed around ***90 videos*** based on Zou's access to Appian's platform.

Q. And Mr. Zou was explaining features and functionality of Appian software?

A. Correct.

. . .

Q. Now, since your deposition, have you had an opportunity to review the videos of Mr. Zou working in Appian's software platform sharing his access with Pegasystems?

A. Yes.

Q. About how many hours of videos have you watched?

A. In total, I've watched approximately 33 hours. Mr. Zou was a subset of that, so I think it was maybe 20 to 24 hours, Mr. Zou's.

Q. And what other videos did you watch?

A. Mr. [Baril's], Mr. Peter [Bessman's], and Mr. Petronio's videos as I recall.

Q. Those were all Pegasystems employees at the time; is that correct?

A. Yes.[9]

57.     In addition to video footage, Pega's "war chest of materials" (PLT 248) also included sales and marketing aids for Pega's "Solutions Consultants"[10] and other members of Pega's salesforce, training materials, screenshots of Appian's platform, "technical briefs," "competitive briefs," "battle cards," PowerPoint presentations, and "kill points" for competing against Appian. Ross addressed one such "technical brief" at the 2022 trial, the "Understanding Appian" brief Pega developed using Zou's information:

Q. Did your review of the videos that were prepared by Mr. Zou for Pegasystems and the other Pegasystems videos help you better understand the meaning of the statements that appeared in this Pegasystems sales document that we've marked Defendants' Exhibit 688 ["Understanding Appian" document dated Jul. 2, 2013, or what Mr. Petronio referred to as the Appian technical brief] and where the

---

[9] 4/27/22 Trial Tr. at 6124:21-6127:24.

[10] Solutions Consultants worked with account executives at Pega on sales opportunities, and their responsibilities included communicating with, and demonstrating Pega's software to, prospective customers.

information was derived from?

A Yes, I've described this as a derivative of their knowledge. And this was after reviewing the videos, it was very clear exactly how that went from Mr. Zou into this derivative content from the preceding Appian documents.[11]

58.    Ross also addressed specific portions of Pega's "Understanding Appian" brief, as well as other sales and tactical documents Pega generated using Zou's information, explaining "[t]he level of detail [of information contained in the documents] . . . represent not only access to our [Appian] documentation but also testing that occurred to understand the behavior of the architecture [of Appian's systems]" (4/27/22 Trial Tr. at 6132:19-24) and required "a comprehensive review of the entire documentation of the software" (*id.* at 6134:21-6135:4) and "direct access to software" (*id.* at 6138:6-16) – documentation and software that contained trade secrets and for which access was highly restricted. As Ross explained, "this entire ['Understanding Appian' document] is derivative of trade secrets through access to our software documentation" (*id.* at 6190:22-25) or, put another way, is "entirely derived with access to our trade secrets" (*id.* at 6197:21-25).

59.    Pega personnel also admitted that its materials, including Pega's "12 Challenges" document, incorporated Zou's information:

Q. Mr. Schuerman [Pega CTO], you're not denying to the jury, sir, that that 12 challenges document, a document that your company prepared and you helped edit and you continued to use from 2012 from many years later, that that document contains information provided by Mr. Zou that was not previously available to Pegasystems, correct?

A. Correct, I'm not.[12]

60.    Pega widely used the above-mentioned "Understanding Appian" and "12 Challenges" documents, as well as other sales and marketing materials, to "set . . . traps" and

---

[11] 4/27/22 Trial Tr. at 6130:8-21.
[12] 4/27/22 Trial Tr. at 6378:2-11.

"torpedo Appian" in "head-to-head interaction[s]."

61.    One example occurred during Pega's head-to-head competition with Appian in 2015 over the U.S. Census Bureau's contract for the 2020 Census.[13] As Pega was actively meeting with the U.S. Census Bureau in 2015, Pega's sales lead on the U.S. Census Bureau opportunity (Thomas Oleksiak ("Oleksiak")) accessed technical briefs Pega had generated using Zou's information, sharing them with his boss and others at Pega and describing them as an "interesting war chest of materials" to use against Appian on the 2020 Census competition.[14] As Oleksiak later testified, he accessed the materials in connection with the U.S. Census Bureau competition, finding them "directionally helpful."[15] Pega was awarded the 2020 Census contract over Appian.

62.    Pega also embedded Zou's information into documents that Pega left behind with customers and partners, while concealing Zou as the source of the information. For instance, in connection with Pega and Appian's competition over the customer Rabobank, Trefler asked Petronio (former Director, Product Marketing at Pega) for a "***prop***" that Trefler could leave behind with Rabobank to "***help blow this up***" for Appian. PLT 227. On another deal, Pega supplied the customer with documents containing Appian's trade secrets, reminding the client "***we are under NDA, please do not share them.***" PLT 1120.

63.    At trial in the Virginia Action, Appian presented reams of evidence demonstrating that Pega had used Appian's trade secrets to improve Pega's inferior product. For instance, Pega's CPO (Akgonul) was deeply involved in Project Crush, and showed tremendous interest in using

---

[13] Of the 29 vendors that originally pursued the 2020 Census Bureau contract, "eventually it came down to Pega and Appian." 4/25/22 Trial Tr. at 5615:3-7.

[14] 4/25/22 Trial Tr. at 5614:23-5624:17; PLT 248. The 2020 Census sales team included multiple participants in Pega's espionage, such as Leon Trefler, Steve Bixby ("Bixby"), and Shawn Bearden ("Bearden").

[15] 4/25/22 Trial Tr. at 5614:23-5624:17; *id*. at 5674:24-5676:4.

Zou's information to Pega's advantage.[16] On one occasion, after an hour-long "session" with Zou analyzing Appian's capabilities, Akgonul sent Pega's CTO, Vice President of Product Management, and other colleagues several screenshots he had captured from his "[A]ppian session" with Zou.[17] PLT 188. Appian also demonstrated to the jury that, "immediately after attending a session where Mr. Zou walked [Pega] through Appian's Tempo social/mobile product," Pega's Head of Social Product (Agya Garg) recommended "Pega add it into the next version of Pega's platform." 4/19/22 Trial Tr. at 5088. A confidential memorandum Pega wrote two years into Project Crush, also indicated that Pega was leveraging Zou's information to execute "improvements to data modeling," which was a "large target for" future versions of Pega software. PLT 775.

64.    Pega knew its conduct involving Zou was inappropriate and took various steps to conceal it. For instance, in addition to searching for and paying Zou through a middleman, Pega decided that only a small cohort of its employees (Trefler and other officers included) could know Zou's real name. Accordingly, Pega altered internal documents to "remove Youyong's name" (PLT 733), and assigned Zou the generic pseudonym "Matt." *Id.* As a result, to most of Pega's employees, Zou was known as "Matt" or "'the other Matt'": "*[W]e're going to call him Matt (so that he isn't 'outed' as our spy).*" PLT 377; PLT 223. Pega's employees obliged: "My lips are sealed . . . *[Zou] will now forever be known as Matt.*" PLT 377.

### 2.    Pega's Senior Executives Orchestrated "Project Crush"

65.    Pega's officers and senior executives – including those described below – participated in and condoned Project Crush.

---

[16] According to Petronio, Akgonul was "in charge of project [sic] management, they decide what goes into the product." 2/8/22 Trial Tr. at 1736:15-17.

[17] Akgonul's role in Project Crush also included requesting Zou to obtain detailed information on specific aspects of Appian's software.

66.     *Alan Trefler*: Defendant Trefler was wholly complicit in Pega's scheme. Defendant Trefler personally met with Zou at Pega's headquarters on January 29, 2013, during which Zou logged into Appian's platform and demonstrated it for Pega, and Pega and Zou "collaborat[ed] around [a] whiteboard" regarding ways to employ Appian's trade secrets against Appian. 3/30/22 Trial Tr. at 1678-80; 4/27/22 Trial Tr. at 6387-88. Following up on the meeting the next day, on January 30, 2013, Petronio emailed Trefler to "*[t]hank you for your time yesterday*," and to advise Trefler that Pega was "updating the competitive brief, attack plan, and Appian scalability whitepaper" following Pega's meeting with Zou on January 29. PLT 194.

67.     Trefler also received and reviewed materials Pega created using Zou's information. For example, on February 19, 2013, Trefler advised Petronio, Leon Trefler, and Kim (Pega's Head of Product Marketing) that Defendant Trefler was meeting "with Rabobank next week in a *head-to-head interaction against Appian. I would like a 'prop' I could leave with them that will help blow this up . . . I need some[thing] simple and winning by the end of this week.*" PLT 227. Petronio promptly responded to Trefler: "Here is that draft of that updated competitive brief on Appian (for Rabo). I've included the new information we've learned." *Id.* Pega then left the "competitive brief" with Rabobank, after which Pega won Rabobank's business over Appian. As another example, on or about February 26, 2014, Trefler and other Pega executives received *over two hundred presentation slides* featuring information on Appian (including actual screenshots of Appian's platform) that Pega had obtained from Zou.

68.     *Don Schuerman*: Schuerman (Pega's CTO and Vice President of Product Marketing) also huddled with Zou and others at Pega's headquarters on January 29, 2013. As Schuerman testified, Zou showcased Appian's platform to Pega during this in-person meeting:

> Q. By the way, during that meeting [the January 29, 2013 meeting], Mr. Zou logged into Appian's platform and demonstrated it to Pegasystems' personnel,

correct?

A. I believe so, yes.[18]

69.     Schuerman's involvement also included receiving progress updates on Project Crush, as well as reviewing internal documents and videos Pega created using Appian's trade secrets. In addition, Schuerman drafted specific technical questions he wanted Zou to answer for Pega, and helped Pega develop salesforce training materials using Appian's trade secrets.[19]

70.     **Leon Trefler**: Leon Trefler – Pega's CCM, Head of Global Sales, and Defendant Trefler's brother – also participated in Project Crush. In addition to helping arrange funding to hire Zou, and meeting with Zou at Pega's headquarters on January 29, 2013, Leon Trefler also helped develop Pega's sales team and strategy, and in that role spurred Pega's salesforce to exploit Appian's misappropriated information. For instance, in a February 2, 2013 internal email declaring **Pega "should never lose against Appian,"** Leon Trefler advised Pega's management that "[i]f your team is competing against Appian anywhere, ***please get in touch with Don Schuerman or John Petronio ASAP to get a briefing on where you should attack Appian***. . . . [W]e know where and how to attack them. The competitive materials on Appian are being revised to reflect what we have learned. . . . ***Get a hold of Don or John and let's get these attacks in the hands of our sales teams ASAP.***" PLT 196.

71.     **John Petronio**: Petronio worked as a Director of Product Marketing in Pega's competitive intelligence group until Pega fired him in 2015.[20] Petronio's duties at Pega included developing plans for competitive strategies, working closely with Pega's sales and product management teams in understanding Pega's competition, creating "attack materials" for Pega's

---

[18] 4/27/22 Trial Tr. at 6388:21-25.
[19] Schuerman also signed verifications to Pega's interrogatory responses in the Virginia Action, as well as testified on behalf of Pega as a corporate designee.
[20] Schuerman took over Pega's competitive intelligence group in 2015.

salesforce, assisting with executive management requests, and helping create board packages for Pega's Board of Directors. 1/6/22 Petronio Depo. Tr. at 264.

72.    Petronio helped Pega retain Zou in early 2012, and worked closely with Zou until September 2014. In addition to communicating often with Zou, Petronio also arranged and attended meetings between Zou and Pega's employees. For instance, on or about December 12, 2012, Zou met with Petronio and Pega product managers to demonstrate how to build an application within Appian's platform.[21] Petronio also organized Zou's meeting with Trefler and other executives at Pega's headquarters on January 29, 2013, as well as Zou's session that same day with Pega's product management team. As Petronio testified, "Alan Trefler [was] at the meeting with . . . Zou" and others on January 29, 2013, during which "Alan was sitting at the head of the table, facing a screen" while Zou was "projecting, showing how to build an application in Appian."[22]

73.    Petronio also disseminated within Pega materials Zou had covertly downloaded using his Appian credentials, and communicated to Zou Pega's requests for specific information about Appian's software. For example, Petronio advised several of Pega's executives (including its Chief Marketing Officer ("CMO"), CPO, and Vice President of Product Management) in a February 20, 2012 email that Petronio had recorded his "session today" with Zou (during which Zou "walked [Petronio] through creating and deploying a simple application" in Appian) and would "put the camtasias [video footage] in my staff directory" for others to view. PLT 547.

74.    **Ben Baril**: Baril (Director, Office of the CTO) helped Petronio hire Zou in 2012 and worked closely with Zou as part of Project Crush.[23] Baril also developed several internal

---

[21] Petronio reported to Kim (Pegasystems' Head of Product Marketing).
[22] PLTD-010.8.
[23] Baril reported to, and communicated regularly with, Schuerman.

documents using Zou's information, created hours of video footage featuring Appian's trade secrets, and collaborated with Zou on multiple occasions. For instance, Baril "spent two days with [Zou]" at Pega's headquarters, "watching [Zou]" navigate the Appian platform, "asking [Zou] questions throughout the process and taking a ScreenCam [video recording] for review at a later date." PLT 775. Baril circulated to colleagues the footage he and Zou captured within Appian's platform.

75.    Baril also co-wrote Pega's formal Project Crush memorandum in 2014. Among other things, the Project Crush memorandum listed various "Action Item[s]" to guide Pega moving forward based on its learnings from Project Crush. *Id.* One "Action Item" – "[o]pen a dialogue with Product Management leadership to give them feedback" – was already "***[u]nderway" as "John has setup recurring meetings with Product Management including Alan.***" *Id.* Another "Action Item" – "[g]ive feedback to product about the development experience, and suggestions on how it can be better – was also "[u]nderway." *Id*. A third "Action Item" – ***[d]iscuss potential improvements to data modeling with [Product Management]" – was designated "[c]ompleted . . . Data Modeling is a large target for [version] 7.2.***" *Id.*

76.    Project Crush also included Kim (Pega's Head of Product Marketing) and Bixby (Pega's Vice President of Product Management). Among other things, Kim beseeched others at Pega to use Zou's information and "exploit the weaknesses of our competitors so that they can set the right traps and scenarios for us to win." 1/14/22 Kim Depo. Tr. at 139, 181. On March 25, 2013, for example, Kim sent Leon Trefler and other colleagues two "competitive briefs" Pega had created using Zou's information, boasting "***[i]f we use these two [documents] carefully – we will win EVERYTIME.***" PLT 721. Bixby also participated in Pega's scheme, including by receiving and reviewing materials featuring Zou's information, and conferring with Petronio and others over

the substance of meetings Pega held with Zou.

**3.    Beginning in 2019, Pega's Senior Executives Directed Another "Teardown" of Appian's Platform**

77.    In 2019, there remained at Pega "a tremendous amount of interest in learning" about Appian's software. 1/10/22 Baril Depo. Tr. at 101; PLT 648. Accordingly, Defendant Trefler, Schuerman, Leon Trefler, Baril, and others commenced another "teardown" of Appian's platform. Project Crush had proven a raging success and yielded a "war chest" of materials Pega employed for years to come. PLT 248. Pega sought to build on that success, by misappropriating Appian's information through an operation "similar" to "Project Crush" but "broader [in] scope." 1/10/22 Baril Depo. Tr. at 201, 299.

78.    Pega initially plotted to again use an outside party for this new teardown, similar to how the Company had used Zou as a "spy" with Project Crush. As Baril testified in 2022, Pega's initial plan involved "hir[ing] an independent Appian contractor to help [Pega] get some of the details about [Appian's] methodology and potential software weaknesses" (*id.* at 206), as well as purchase an Appian license for Pega. Leon Trefler supported Pega's plan, remarking in a February 13, 2019 internal email that "BP3," an outside contractor, "would be a great one to hire to do some diligence for us" on Appian, adding he was "sure" an outside contractor could obtain a free trial of Appian's platform so that Pega could "do a side by side compare around different builds." PLT 752. Pega continued to develop its plan in March 2019, as Defendant Trefler, Schuerman, Leon Trefler, Akgonul, Bixby, and other executives discussed a "consulting engagement to deep dive Appian's product, training, methodology (all aspects of the client journey)." 1/10/22 Baril Depo. Tr. at 293. Despite its efforts, Pega could not find a contractor willing to misappropriate Appian's information on Pega's terms, so Pega decided to spy on Appian itself.

79.    Pega's officers and senior executives were a driving force behind this teardown,

none more so than Defendant Trefler. As Schuerman advised Baril around August 19, 2019, Baril was to "work on a ***critical CI [competitive intelligence] Brief for Alan [Trefler]*** due 8/30/19." 4/28/22 Trial Tr. at 6433; PLT 660.

80.      Baril regularly discussed Pega's "teardown" with Schuerman, including "***several conversations about Alan [Trefler's] desire for [Pega] to have more technical – sort of deeper dive technical details***" about Appian. 1/10/22 Baril Depo. Tr. at 100. Leon Trefler also remained informed regarding Pega's teardown. For instance, on or around September 8, 2019, Baril sent Leon Trefler a draft of the Appian "full teardown and competitive" brief that Baril, Schuerman, and others at Pega were developing under Trefler's direction. *Id.* at 308.

81.      Defendant Trefler followed up with Baril and others regarding Pega's teardown. For instance, in an internal email dated September 21, 2019, Trefler told Baril he was "***thrilled to have you in this role,***" and reminded Baril, Schuerman, Akgonul, and Tom Libretto ("Libretto") (Pega's then-CMO) that Trefler wanted a "***write up [o]n everything we think is an ap[p]ian weakness,"*** and wanted ***"to spend an hour on a[n Appian] demo.***" PLT 622.

82.      Baril also updated Pega's executives regarding Pega's efforts to gain access to Appian's platform. For instance, on September 25, 2019, Baril wrote to Schuerman and Jennifer Gill ("Gill") (Pega's Senior Director of Product Marketing): "FYI – ***Alan [Trefler] asked for an hour long demo of Appian.*** This is currently impossible. My trial ended and the other system I was using is no longer accessible. ***I'll work on finding another one of [sic] getting another trial (involves registering a domain, email etc.***" 1/10/22 Baril Depo. Tr. at 65; PLT 631-A.

83.      On September 27, 2019, Baril boasted to Schuerman and Gill: "***My spies have managed to get me another 15 day instance***" of Appian's platform "[l]ikely up on Monday." 1/10/22 Baril Depo. Tr. at 81; PLT 631-A. On or about the same day, Baril also informed

Schuerman that Barak (a director in Pega's Product Management) had recorded a "fabulous" hour-long demo of the Appian platform, and Baril provided Schuerman a link to the video. 4/28/22 Trial Tr. at 6427. Schuerman was pleased that Trefler's "mission" was on track, responding to Baril: "*Awesome. So we have some stuff we can show Alan* . . . ." *Id.* at 6428:8-12.

84.     On or about September 27, 2019, Baril also informed Schuerman that a Pega "spy" (Pega Solutions Consultant Nguyen Le ("Le")) was posing to Appian as a "small independent business" in order to obtain an Appian license for Pega, telling Schuerman "*[m]y spy also got a quote for Appian*." 4/28/22 Trial Tr. at 6429:18-21. In response to Schuerman's inquiry regarding "how many users" could use the license Pega's "spy" was seeking, Baril responded the "quote" "was for a small independent business so I imagine a handful at most." *Id.* at 6429:25-6430:8; 1/10/22 Baril Depo. Tr. at 354. Baril further informed Schuerman that the "small independent business" actually belonged to Le's wife: "*It's an [Solutions Consultant] whose wife owns a small business . . . [in] the beauty industry*." 4/28/22 Trial Tr. at 6430:4-6431:3.

85.     Defendant Trefler knew his "teardown" depended on improperly obtaining access to Appian's platform, just as Project Crush had. Indeed, in an internal email dated October 1, 2019, Baril cautioned Defendant Trefler (as well as Schuerman, Gill, and Libretto) that "*Appian is very tightly controlled about who has access to their trial environments*," while assuring them that he was "*working to get a new instance so that I can record some videos of their environment for you*." 1/10/22 Baril Depo. Tr. at 71; PLT 632. Three days later, on October 4, 2019, Baril admitted to Pega's Director of Solutions Consulting that "Alan [Trefler] and Leon [Trefler] are very focused on destroying Appian. Like making it go away for good." PLT 649.

86.     Baril updated Leon Trefler, Schuerman, and Gill in an October 5, 2019 email, writing:

> Alan [Trefler] has been asking Don [Schuerman], Jenn [Gill] and I to dig deep into Appian's technology in order to find more compelling weaknesses to form a more targeted and damning attack. To that end, I've been spending much of my time over the last few weeks diving deep into Appian's software, including taking some videos of various features and functionality and documenting everything I can find. You saw an iteration of that work a few weeks ago, the latest technical document can be found here.

PLT 759; 1/10/22 Baril Depo. Tr. at 188.

87.    Leon Trefler responded to Baril later that day: "Please set up a call for next week. Your mission is urgent and you are understaffed. I want you to think aggressively." Leon Trefler added he would devote "more resources" to Pega's "mission." 1/10/22 Baril Depo. Tr. at 191; PLT 760.

88.    In addition to having attended client meetings with Trefler, Baril also conferred one-on-one with Trefler regarding Pega's teardown. For instance, Trefler met with Baril at least twice in late 2019 regarding the teardown (once in October 2019 and again in December 2019), including in Trefler's office. During their meetings, Trefler discussed with Baril specific information Pega had obtained about Appian's platform. Trefler also provided Baril with direction and feedback on Baril's ongoing efforts to spy on Appian, identified specific technical details about Appian's platform that Trefler wanted investigated, and listed questions and topics about Appian's platform that Trefler wanted Baril to look into.

89.    Pega was determined to complete Trefler's mission at all costs, even if it violated the law. For example, after advising Schuerman in an October 17, 2019 internal chat message that Baril had "[l]ost access to [Appian's] trial system last night," Baril pointedly asked Schuerman, "*[w]ho can I ping about legality of using [Appian's] system?*" PLT 643-A. Baril's concerns over the illegality of Pega's actions were well justified. Moreover, Pega's Code of Conduct (the "Code") expressly prohibited employees from using "illegal or questionable means" or

"*misrepresenting your identity in hopes of obtaining confidential information*" – precisely what Pega was doing.[24]

90.    Schuerman knew Trefler was driving the teardown, and that Pega's "mission" required continued access to Appian's platform. Accordingly, instead of directing Baril to seek "guidance as to the propriety of [Pega's] actions" – as Pega's Code required – *Schuerman disregarded Baril's concerns and instead responded: "[H]ow much more do you need to do/capture?*" PLT 643-A.

### 4.    Pega's Employees Used Fake Names, Fake Companies, and Corporate Fronts to Execute the Teardown

91.    Pega utilized its network of "spies" and other vast resources to accomplish Trefler's mission of misappropriating Appian's trade secrets.

92.    Baril himself resorted to subterfuge to misappropriate Appian's trade secrets. For instance, in or around August 2019, Baril concocted multiple fake names, including "Andrew Powers" and "Emily Gold," in order to misappropriate Appian's trade secrets. 1/10/22 Baril Depo. Tr. at 79-80. Baril also created a fictitious consulting firm, "Andrew Powers Consulting" (complete with its own unique web domain), which he used to gain access to Appian's platform. *Id.* at 79-80. Baril informed Schuerman on August 17, 2019 that Baril had obtained access to Appian's platform.

93.    Baril recruited others to illicitly access Appian's platform as well. Around September 2019, Baril enlisted Le (a Solutions Consultant at Pega) to help Pega misappropriate Appian's information by obtaining a 15-day trial of Appian's software. In addition to working at

---

[24] Pega's Code provided that employees agree that "[i]f any of [Pegasystems' employees] are asked to depart from this Code, whether by our supervisor, another employee or anyone else, we agree to seek clarification and/or guidance as to the propriety of the actions in question from our Chief Executive Officer or our Chief Compliance Officer."

Pega, Le co-owned a salon business ("Organic Living and Wellness") with his wife. 12/3/21 Le Depo. Tr. at 73. At Baril's behest, Le obtained a 15-day trial of Appian's platform, by falsely representing himself to Appian as a potential "customer" named "Organic Living and Wellness." On October 2, 2019, Le provided Baril with login credentials Appian had issued to "Organic Living and Wellness." Baril – posing as "Organic Living and Wellness" – accessed Appian's platform using Le's credentials, telling Le: "Thanks so much! [Over] 15 days to make magic happen. . . . *[T]his system . . . is extremely helpful.*" 1/10/22 Baril Depo. Tr. at 340; PLT 629

94.    Baril also recruited Michael Fine ("Fine") (a Solutions Consulting Manager at Pega) to assist with Pega's teardown. In addition to working at Pega, Fine co-owned a business space rental company ("Palencia Business Center") with his wife. 12/1/21 Fine Depo. Tr. at 26. Baril asked Fine to obtain a trial of Appian's platform for Baril, cautioning Fine not to disclose his affiliation with Pega when seeking the trial from Appian. Fine carried out Baril's request and obtained a free trial of Appian in October 2019 by falsely posing as a potential "customer" called "Palencia Business Center." Fine then provided Baril the login credentials Appian had issued to "Palencia Business Center." Fine also set up a new email account for Baril, using Fine's palenciabusinesscenter.com web domain, to facilitate Baril's access to Appian's platform. Posing as "Palencia Business Center," Baril used Fine's credentials to access Appian's platform.

95.    In October 2019, Baril enlisted Peter Bessman ("Bessman") (a Pega Solutions Engineer) to assist with the teardown. As Baril explained to a senior employee on October 10, 2019, Baril was "looking to pull Peter [Bessman] into the Appian CI [competitive intelligence] project starting immediately until the end of the year. The work Peter will be doing is outlined below: *The overall goal is to <u>steal</u> 4 deals from Appian in Q4 and Q1 2020.*" PLT 651.

96.    Baril sent Bessman the Appian credentials that Fine had given Baril. Bessman,

posing as "Palencia Business Center," then logged into Appian's platform, wherein he "hunker[ed] down," and "sho[t] a ton of footage" ("*as much . . . footage as possible*") of himself building an application within Appian's platform. 1/10/22 Baril Depo. Tr. at 86; 12/15/21 Bessman Depo. Tr. at 123, 133, 236. The 54-minute video Bessman captured while posing as "Palencia Business Center" – one of at least *30 videos* Pega created during or after 2019 using its employees' illicit access to Appian's platform – was then shared with Defendant Trefler and several other Pega employees.

97.     Pega's U.S.-based employees also collaborated with Pega's India-based employees in misappropriating Appian's trade secrets.[25]

98.     For example, around September 2019, Vijay Krishna Potluri ("Potluri") (a Director of Case Management at Pega in India and member of Pega's Product Management group) accessed Appian's platform using credentials he had obtained from a Product Manager at Pega in India, Arun Kumar Sarada ("Sarada"). Potluri's "responsibilities" included working on "releases and improvements" to Pega's software. 3/3/22 Potluri Depo. Tr. at 26. Posing as someone else, Potluri used the credentials he received from Sarada to access Appian's platform and share his findings with several of Pega's software engineers and developers. Potluri accessed Appian's platform multiple times, including in 2020.

99.     Sarada used three different login credentials – none of which belonged to him – *to access Appian's platform while working at Pega*: (i) one set of credentials belonged to a former colleague of his from the company OpenText, Inc.; (ii) the second set of credentials he received from his cousin (Vishal Sarada), which Vishal in turn had obtained while working at the information technology firm Capgemini; and (3) the third set of credentials he had received from

---

[25] According to Pega, around 29% of its employees were based in India during the Relevant Period.

another cousin of his (Venugopal Sarada), and belonged to Edu Mithra, an online education company.[26] To assist Pega with its corporate espionage efforts in 2019, Sarada used at least one of these credentials to access and capture footage of Appian's platform.

100.    Pega's efforts to misappropriate Appian's trade secrets continued into 2020.

101.    For instance, in March 2020, Baril enlisted Keith Fairbrother ("Fairbrother") (a member of Pega's "go-to-market strategy group") to sign up for an Appian trial. 1/10/22 Baril Depo. Tr. at 109. To evade detection, Baril directed Fairbrother to register for the trial using Fairbrother's "side project domain" (a website that generated baby names) instead of Pega's web domain. *Id.* at 111.

102.    On or about May 12, 2020, Baril accessed an Appian conference by registering under one of his personas, "Andrew Powers." Upon infiltrating Appian's conference, Baril quickly alerted Schuerman via instant message that he had used a fake name ("Andrew Powers," Baril's self-proclaimed "incognito self") to break into the conference. 4/28/22 Trial Tr. at 6442-43. Baril and Schuerman then communicated about the conference via instant messaging. In addition to asking Baril specific technical questions about Appian's conference, including its broadcast technology, Schuerman asked Baril to "export the customer list" and "send [Schuerman] some screenshots of the overall experience." *Id.* at 6445:2-7.

103.    As alleged in herein, Pega employees Potluri and Sarada accessed Appian's system in 2019 and 2020 by posing as someone else. Around May 23, 2020, Potluri emailed Baril and Bixby (Pega's Vice President of Product Management), along with Pega software engineers and others about "the details of" Potluri's and Sarada's findings on Appian. PLT 627. Potluri included

---

[26] Sarada possessed Appian credentials much earlier than 2019. For instance, on September 18, 2017, Sarada emailed several Pega employees login credentials to Appian's platform, warning them to "make sure any recording or screenshots don't capture user name." PLT 1027.

in his email links to various documents Pega "created based on [its] access to Appian software and gathering information from that access." 3/3/22 Potluri Depo. Tr. at 92-108. Bixby was incredibly pleased with Potluri's insights, remarking on Potluri's "[e]xcellent" work, and asking Potluri for "***any key competitive insights that would be worth sharing as we determine the scope of work for [Version] 8.6.***" *Id.* at 290. Potluri responded to Bixby's May 24, 2020 email by listing various "ideas worth considering" for Pega Version 8.6, which Pega released a year later in May 2021. *Id.* at 290-91.[27]

104.    Pega continued its scheme against Appian even after Appian sued Pega for this very conduct. On or about May 28, 2020, Baril discussed with Aaron Fromm (a Pega Solutions Consulting Manager) gaining access to an Appian trial in order to "create a side-by-side comparison of the Appian flow versus Pega flow." 1/10/22 Baril Depo. Tr. at 73.

105.    Vijay Vaddem (a Senior Product Manager at Pega) obtained access to the Appian platform in September 2021, by posing as someone else. Others at Pegasystems accessed Appian's platform after the Virginia Action was filed, including in mid-2021 and around October 2021. Meanwhile, Eric Davis ("Davis") (a Solutions Consultant at Pega) testified during his January deposition that he gained access to an Appian trial in December 2021, "***shortly after learning of this suit.***" 1/21/22 Davis Depo. Tr. at 164.

106.    Similar to Davis, Potluri testified he did not learn of the Virginia Action until ***December 2021***, three months before Appian took Potluri's deposition. Potluri and Davis were just two of an unknown number of Pega employees who remained ***oblivious to the Virginia Action*** and free to continue Pega's scheme to misappropriate Appian's trade secrets.

107.    Indeed, evidence showed that Pega failed to discipline employees that participated

---

[27] Potluri accessed Appian's platform in 2019 and 2020, including while Pega was developing its Version 8.4 (which Pega released on February 25, 2020).

in Pega's scheme, leaving employees free to continue spying on Appian and using Appian's trade secrets to win business during the Relevant Period.

108.    For instance, Schuerman admitted in October 2021 that, *to his knowledge*, Pega management had never directed its employees to not seek access to Appian's platform:

> Q. Has Pegasystems management ever directed Pega employees to not seek access to Appian's platform?
>
> A. I don't think explicitly, no.
>
> Q. An email has never been sent out?
>
> A. Not to my knowledge, no. 10/13/21 Schuerman Depo. Tr. at 51.

109.    Pega's CPO (Akgonul) admitted during his January 25, 2022 deposition that none of the India-based employees who had accessed Appian's platform using others' credentials had been disciplined. Defendant Trefler's testimony further revealed that none of the senior Pega executives involved in Pega's scheme received "any formal disciplinary consequences," leaving Pega's employees free to build on their scheme during the Relevant Period:

> Q. Now, have you considered firing Benjamin Baril?
>
> A. No.
> . . .
>
> Q. Have you considered in connection with issues that have come up in this lawsuit firing any other Pegasystems executives or employees?
>
> A. No.

## 5.    Pega's Officers, Senior Executives, and Other Employees Received and Maintained Access to Appian's Misappropriated Information

110.    Pega ensured that Appian's valuable trade secrets were provided to Pega's officers, senior executives, and other employees.

111.    Employees routinely emailed one another documents containing Appian's trade secrets. For instance, on March 25, 2013, Kim emailed Leon Trefler and others two of Pega's

competitive briefs on Appian, declaring "*[i]f we use these two docs carefully – we will win EVERY TIME.*" PLT 721. As another example, on December 4, 2019, Baril sent an email to various Pega employees in which Baril "included links to some videos" that "give insight into some of the woes of creating applications in Appian," while cautioning the "*videos are STRICTLY INTERNAL.*" PLT 761. On another occasion, Baril emailed Bixby to inform him that Baril had an "Appian trial system for a few more days and wanted to know if anyone [from Pega's product management group] would like to get any specific intel/demos before it expires." 1/10/22 Baril Depo. Tr. at 211. In response, Bixby provided Baril with three employee "listserv" addresses, including pxmanagement@pega.com (Bixby's "direct reports") and pxall@pega.com (Bixby's "entire organization of about 500 people"). *Id.* at 211-12.

112.    Pega also saved materials containing Appian's trade secrets on shared directories accessible to employees, including "Sales Hub" and "Box."[28] For example, during a WebEx meeting with other Pega employees on or about September 11, 2019, Baril helped create an hour-long recording within Appian's platform, which was then saved to a shared folder at Pega. One of the WebEx attendees – Pega employee Barak – then circulated the video to various colleagues, cautioning them in a September 11, 2019 email: "*[T]he situation between u[s] and Appian is apparently a bit sensitive right now, so please be judicial in sharing this.*" PLT 624. Pega's employees also shared Appian's trade secrets via internal message "posts" and shared hyperlinks to documents saved on Pega's system.

113.    Pega employees would also reach out to members of the competitive intelligence group in connection with competition against Appian. Meanwhile, Baril and other employees with illicit access to Appian's platform would solicit requests for specific information about Appian

---

[28] Pega's worldwide sales team had access to Sales Hub.

from others at Pega (including Pega's Product Management group).

114.    Pega also paid its employees bounties for obtaining and sharing Appian's information. For instance, Pega awarded extra compensation to employees for completing management-based objectives ("MBO"), one of which required employees to obtain and internally present information regarding *competing platforms*. For example, Bessman (one of Pega's "spies") internally circulated a presentation on Appian as "homework or proof to receive his MBO credit." 9/23/21 Baril Depo. Tr. at 122. Meanwhile, Fine and Le – the Pega employees who posed as small businesses to obtain Appian credentials in 3Q21 – both received cash bonuses in 3Q21 for their competitive intelligence on Appian. 1/10/22 Baril Depo. Tr. at 352-54.

**B.    Pega Conceals from Investors its Scheme to Misappropriate Appian's Trade Secrets, its Resulting Potential Liability, and Appian's Ultimate Lawsuit Alleging Egregious Misconduct Involving Pega's Senior Executives**

115.    Pega closely guarded its scheme to spy on its chief competitor and wrongfully acquire Appian's trade secrets. Pega did not disclose those activities to investors, leaving investors with the misimpression that Pega's business was driven by its own innovation and its products' competitiveness in the marketplace. In reality, Pega's business was driven by unlawfully aping Appian. Likewise, Pega did not disclose to investors the potentially massive liabilities associated with such an unlawful business plan. Indeed, even when those liabilities materialized into a lawsuit by Appian, Pega kept investors in the dark.

116.    In early 2020, two whistleblowers (both former Pega employees) disclosed evidence of Pega's scheme to Appian.

117.    Petronio came forward in January 2020. Petronio had joined Appian in early 2019, however, he had remained silent about Pega's work with Zou until January 2020, out of fear of

retaliation by Pega.[29]

118.    Bearden approached Appian shortly thereafter, in February 2020. Pega had employed Bearden for 12 years before firing him in early 2020. Bearden had worked on Project Crush with Baril, Petronio, and others, and possessed intimate knowledge of Pega's scheme to misappropriate Appian's trade secrets over the years. Bearden had also worked on deals for which Pega employed Appian's misappropriated information, including a deal over customer Bank of America in which (as Bearden later testified in September 2021) "Appian was kicking [Pega's] butts." 9/20/21 Bearden Depo. Tr. at 242.

119.    Following his termination from Pega in early 2020, Bearden came across a thumb drive containing a cache of Appian documentation that Zou had misappropriated for Pega. Bearden wrote to Pega's Human Resources ("HR") division on February 15, 2020, noting he had discovered a "USB drive containing Appian documentation that Pega acquired back in 2014 from an Appian consultant [Zou] who our marketing team hired." *Id.* at 242. Bearden explained to Pega's HR that the documents "***clearly are not our [Pega's] IP, but we did pay for them,***" and asked Pega's HR to "[p]lease let me know if you would like the documents returned to you ***or whether I should return them to Appian.***" *Id*. at 243.

120.    Bearden sent Pega the electronic documents at Pega's request. Shortly thereafter, Pega asked Bearden to confirm "if I still had the documents in my possession and ***if I had notified anybody that I had had the documents.***" *Id.* at 245.

121.    As Bearden later testified, he was "troubled" by Pegasystems' request for confirmation that he had told no one else about the Appian documents:

> [U]p until that time, 2019 . . . all of us having access to Appian

---

[29] For instance, Petronio testified in early 2022 he "was concerned . . . [because] in the past, there have been former employees who had been sued for either going to a competitor or whatnot." 2/8/22 Trial Tr. at 1722:12-1723:9.

documents and whatnot, obviously seemed very shady . . . My assumption was, even as shady or gray as it seemed, it was all aboveboard. This was the first time that I began to think maybe it wasn't all aboveboard and was wondering. . . what I had been a part of.

*Id.* at 245-46.

122.    According to Bearden, following his termination from Pega, the Company:

***Never asked me about any Pega IP that I might have in my possession or if I got rid of it*** . . . Pega never followed up with me about did you return all of the architecture slides you created in the last 12 years, any of the white papers, any of the competitive intelligence we had. They never followed up on that. ***This is the only thing they wanted to know about, that they followed up on.***

*Id.* at 246.

123.    Pega's request for assurances that no one else knew about the misappropriated documents, as well as Pega's apparent lack of concern over anything else but the Appian documents, was a "turning point" for Bearden. *Id.* at 245. He reached out to Appian's general counsel a day or two later to inform Appian of the scheme.

124.    On May 29, 2020, Appian filed suit against Pega and Zou. Appian's operative complaint at trial included claims under the VUTSA and the VCCA and sought damages in an amount not to exceed $3,032,847,000 (exclusive of attorney's fees, interest, and other relief). In addition to its actual losses, and unjust enrichment damages, Appian's request for relief also included attorney's fees, costs, punitive damages, and treble damages.

**C.    Pega Discloses the Virginia Action on the Eve of Trial in February 2022, While Misleadingly Assuring Investors Appian's Claims Lack Merit and Any Claims for Damages Are Unsupported**

125.    On February 16, 2022, Pega filed its Report on Form 10-K for fiscal year 2021 (the "2021 10-K"), disclosing for the first time the existence of the Virginia Action and falsely stating Appian's claims "***are without merit***," Pega has "***strong defenses to these claims***," and that "***any***

*alleged damages claimed by Appian are not supported by the necessary legal standard.*"
Defendants also continued to conceal evidence of their years-long scheme to misappropriate
Appian's trade secrets.

126.    Pega filed its Report on Form 10-Q for the first quarter of 2022 on April 28, 2022
(the "1Q22 10-Q"), over a month after trial in the Virginia Action had begun on March 21, 2022.
Similar to its 2021 10-K, Pega's 1Q22 10-Q omitted material facts regarding its scheme to
misappropriate Appian's trade secrets.

**D.    Following a Seven-Week Trial, a Jury Awards Appian over $2 Billion in Damages**

127.    The seven-week merits trial ended with the jury charge and closing arguments on
Thursday, May 5, 2022.

128.    On Monday, May 9, 2022, the jury returned a unanimous verdict in favor of Appian.
The jury concluded Pega and Zou had misappropriated Appian's trade secrets in violation of the
VUTSA, and awarded compensatory damages of $2,036,860,045 (before interest) as against Pega
and $5,000 as against Zou. The jury also found Pega acted willfully and maliciously in
misappropriating Appian's trade secrets, entitling Appian to later seek approximately $22.6
million in attorney's fees and $4.2 million in costs. The jury also found Pega had committed
computer crimes in violation of the VCCA, and awarded Appian the one dollar in symbolic
damages it sought under the VCCA.

129.    In touting their post-trial options for vindication, Defendants publicly stated the
verdict was "ridiculous," that there were no "facts of any wrongdoing," that the facts did not
support an award of ***any damages***, and that "[t]he implication . . . that Pega's CEO accessed any
Appian free trials is categorically false." Specifically, Defendants stated on May 12, 2022: "[T]he
claims and the recent verdict" were "not supported by the facts of the case," and disputed as

"categorically false" the "implication" that Defendant Trefler "accessed any Appian free trials." Defendant Stillwell stated during a May 18, 2022 analyst call with Needham & Company, LLC that the verdict was "ridiculous," there were no "facts of any wrongdoing," and "certainly no damages that would ever suggest a dollar amount," and, additionally, during a May 23, 2022 analyst call with JPMorgan Chase & Co., he stated the facts of the case could not possibly "suggest a dollar amount" of damages, let alone "$1 of damage."

130.    Then, before trading hours on September 16, 2022, Pega announced that the court in the Virginia Action had entered judgment in favor of Appian, denying Pega's motion to set aside the verdict and ordering Pega to pay Appian $2,036,860,045 in damages, nearly $24 million in attorney's fees and costs, and post-judgment interest of approximately $122 million per year. The court also entered judgment against Zou in the sum of $5,000, plus interest.

131.    Pega appealed several aspects of the verdict and judgment in the Virginia Action, including the jury's computation of damages and the underlying merits of Appian's trade secret claims. Pega did not appeal the verdict on Appian's VCCA claim.

132.    On July 30, 2023, a Virginia appellate court issued its decision on Pega's appeals. With respect to the computation of damages, the appellate court agreed with Pega that the jury had been improperly instructed with regard to the appropriate measure and computation of damages, and the appellate court ordered a new trial on that basis.

133.    With respect to the merits of Appian's trade secret claims, however, the appellate court affirmed that Appian had put forth sufficient evidence to support the jury's verdict against Pega. Despite Appian taking "careful steps to safeguard its secrets and that the information was neither 'generally known' nor readily ascertainable," the appellate court wrote, "the evidence . . . reveals that Pega used a 'spy' to obtain access to Appian's software and confidential

'documentation.'" *Pegasystems Inc. v. Appian Corp.*, 904 S.E.2d 247, 265 (Va. Ct. App. 2024). Among other unlawful conduct established by the trial record, the appellate court further described how "Pega initiated a program dubbed 'Project Crush' where it analyzed Appian's strengths and weaknesses," and then "created or updated marketing materials attacking Appian based on these vulnerabilities. *Id*. at 268.

134.    In sum, notwithstanding questions about the proper measure of damages, the appellate court affirmed that in all material respects that Appian's trade secret claims are meritorious and well-supported by evidence.

**E.    The SEC Investigates**

135.    In a public filing on April 26, 2023, Pega disclosed that the SEC was investigating Pega in connection with the matters alleged herein, including with respect to Pega's accounting treatment of the Virgina Action. Specifically, as stated in Pega's filing:

> Beginning in March 2023, the U.S. Securities and Exchange Commission ("SEC") has requested certain information relating to, among other things, the accounting treatment of the Company's above-described litigation with Appian Corporation. The Company is fully cooperating with the SEC's requests.

**F.    The Securities Class Action Settles**

136.    On May 19, 2022, certain Pega shareholders commenced a class action lawsuit against Pega (the Securities Class Action). As set forth in the operative complaint, the Securities Class Action – like this suit – brings claims under federal securities laws against Pega and certain of its officers in connection with those Defendants' failure to disclose Pega's misappropriation scheme and attendant risks. *See* Securities Class Action ECF No. 61. Specifically, as in this suit, the Securities Class Action brings claims under of §10(b) of the 1934 Act and SEC Rule 10b-5, as well as of §20(a) of the 1934 Act. As set forth below, this suit brings those claims as well as additional claims under §18 of the 1934 Act and common law claims for fraud and negligent

misrepresentation.[30]

137.    On May 15, 2024, the United States District Court for the District of Massachusetts preliminarily approved a class settlement in the Securities Class Action that would establish a settlement fund of $35 million and provide shareholders, on average, with approximately $2.07 of recovery per share. *See* Securities Class Action ECF No. 147. The court also set forth procedures by members of the proposed settlement class could exclude themselves from the settlement and pursue a direct action: *to wit*, by submitting a request for exclusion to the designated claims administrator in compliance with the court's procedures. *Id.* ¶ 16. Plaintiff has submitted such request for exclusion to the to the designated claims administrator in compliance with the court's procedures.

## V.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

138.    During the Relevant Period, Defendants made false and misleading statements and omitted material facts necessary to make the statements not false or misleading. Defendants' false and misleading statements and omissions included: (i) statements touting Pega's competition and sales and marketing practices, while failing to disclose, *inter alia*, it was relying on corporate espionage to gain a competitive advantage; (ii) statements concerning Pega's competitors' intellectual property rights and that infringement claims by unnamed competitors could arise at some indeterminate point, while concealing, *inter alia*, Pega's egregious scheme to misappropriate Appian's trade secrets, the massive potential liability arising therefrom, and, indeed, the existence of the Virginia Action; (iii) statements that Appian's claims lacked merit, while failing to disclose, *inter alia*, Appian's liability and damages claims were well-supported; (iv) statements regarding

---

[30] Whereas the Securities Class Action's claim under SEC Rule 10b-5 appears to focus only on liability for material misrepresentations under subsection (b), Plaintiffs here also plead separate causes of action for both (i) material misrepresentation liability under subsection (b) and (ii) scheme liability under subsections (a) and (c).

Pega's Code and ethical practices, which failed to disclose, *inter alia*, Pega's egregious corporate espionage and flagrant violations of Pega's own guidelines; and (v) statements concerning Defendants' compliance with the federal securities laws, which failed to disclose that, *inter alia*, Pega's Forms 10-K and 10-Q were materially misleading and contained false financial statements.

A.    **Misstatements and Omissions Regarding Pega's Competition and Sales and Marketing Practices in the BPM Market**

139.    On June 16, 2020, Pega participated in a conference call with investors and analysts as a part of the NASDAQ 42nd London Investor Conference. In response to an analyst's question about "the competitive landscape" and how Pega "differentiate[d]" itself from "competitors," Defendant Stillwell stated the following:

> ***Our key is to sell our differentiator to help our clients augment their environments and to make sure we operate well with all of the different application providers that are out there.*** We don't – we believe in open environments so that all of us can kind of work together is actually much better for our clients, because at the end of the day, nobody's going to buy just one application across their entire infrastructure. And I think that, that's important for all of us to continue to work together. ***Even though we do compete fiercely, we also need to stop and help our clients when they need to integrate us with each other.***

140.    During the same call, Defendant Stillwell was asked about Pega's winning the business of the U.S. Census Bureau, including "how you were able to win that versus some of your competitors in the RFP." In response, Defendant Stillwell boasted of Pega's "best-in-class" reputation, while concealing that Pega had accessed its "war chest of materials" developed using Zou's information in competing to win the U.S. Census Bureau's business:

> Sure. So as you can imagine, most of these larger campaigns really try to do a proof of concept or a benchmark on the technology against the problem. And so I think that ***the fact that we won that against 29 vendors and we actually got down selected down to us and another vendor*** and we actually had to compete against the internal development inside of the agency, as you can imagine, that's a fairly competitive environment. ***So I think the fact that we won that and***

> *also our recent win with the IRS really kind of highlights the fact that we're really viewed as a solution that has – that is best-in-class that can actually drive very significant transformations.*

141.    On July 28, 2020, during Pegasystems' second quarter of 2020 earnings call, Defendant Trefler commented on Pega's ability to "show very well competitively" in winning business:

> *Sure. So look, we're working in a highly competitive world. So every piece of business we're winning, somebody else is losing. So that's just the way it goes. And we show very well competitively*, particularly in the sweet spots, which I think our view on low-code goes all the way back to our original vision of being a model- driven platform.

142.    During the same call, Defendant Stillwell boasted of Pega's "credib[ility]" with customers in the public sector, including the U.S. government:

> So I think that, that's what's exciting is we have so much opportunity with our existing installed base, or our existing client base. *And then we have these verticals, like a federal vertical, that's just one country. It's just one buyer really, within that country.* And I think there's just a tremendous amount of opportunity. Our wins at defenses, our wins at IRS, *really just demonstrating how credible we are in that space, even with being relatively – that being a relatively less mature vertical in terms of the growth rate.*

143.    On August 13, 2020, during the 40th Annual Canaccord Genuity Growth Conference, in responding to a question regarding the U.S. Census Bureau and other government customers Pega had secured, Defendant Stillwell likewise touted Pega's "credibility" with the U.S. government:

> **David E. Hynes** *Canaccord Genuity Corp., Research Division – Analyst*
>
> Yes. Yes, makes sense. Public sector, I think, has been an exciting part of the business. *You guys won an IRS deal, I think, that followed a U.S. Census win.* Maybe just talk about what you're seeing in the public sector. Q3 is typically a seasonally important quarter there. *Why are you guys winning in the public sector?*

**Kenneth R. Stillwell** *Pegasystems Inc. – Senior VP, Chief Administrative Officer & CFO*

. . .

*I think that the thing with public sector really becomes as soon as you get credibility of winning a handful of larger agencies, really there's a lot of kind of momentum that comes from that. And I think that our census win really just opened our eyes and quite frankly, the market size on, wow, like this is a great opportunity for Pega*, and governments are going through digital transformation at a much faster clip actually than even commercial is.

144.    On December 10, 2020, during the Barclays Global Technology, Media, and Telecommunications Conference, Pega spoke with investors and analysts about its product portfolio and positioning in the BPM market. One Barclays analyst questioned Pega how it "differentiate[d]" itself in the BPM market:

So we have also seen that BPM market evolve a bit. So it was BPM, and now we hear low-code a whole lot more. And then you – your portfolio acquisition business, digital process automation certified offering. *So help us understand how you're positioned in that market?* Obviously, you were one of the pioneers in BPM. *But given the market evolution, how you're positioned now and what differentiates in that market?*

145.    Without disclosing the ongoing litigation against Appian, or the fact Pega had misappropriated Appian's trade secrets and used that information to enhance its software, Defendant Stillwell highlighted Appian in responding to the analyst:

*Appian is a company that we've competed with in some verticals that has low-code.* Pega has low-code. There are other low-code providers that are – I would call it more the technology of low-code. So there are some other companies that have built very, very simple tools to be able to build simple workflows, like something like I want to check the badge of an employee when they check-in. That application isn't going to expand into something more than that, but you can build it really fast and you can do it with nondevelopers. That's what I would call the low-code, the product.

146.    Pega filed its Report on Form 10-K for fiscal year 2020 ("2020 10-K") on February 17, 2021, touting Pega's competitive differentiators and sales and marketing tactics, while misleadingly failing to disclose the Virginia Action or Pega's egregious misappropriation of Appian's confidential information which it used to improve its product and gain a competitive advantage.

147.    For instance, the 2020 10-K stated the following in purporting to describe to investors what "competitively differentiated [Pega] from [its] competitors" and how Pega "compete[d] favorably" versus companies like Appian:

> **Competition:**
>
> **The markets for our offerings are intensely competitive**, rapidly changing, and highly fragmented, as current competitors expand their product offerings and new companies enter the market.
>
> . . .
>
> We have been most successful in competing for clients whose businesses are characterized by a high degree of change, complexity, or regulation.
>
> **We believe we are competitively differentiated from our competitors** because our unified Pega Platform is designed to allow client business and IT staff, using a single, intuitive user interface, to build and evolve enterprise applications in a fraction of the time it would take with disjointed architectures and tools offered by many of our competitors. . . . **We believe we compete favorably due to our expertise in our target industries and our long-standing client relationships.**

148.    The 2020 10-K also stated the following in purporting to describe Pega's "Sales and Marketing" techniques, while failing to disclose that Pega's "efforts" included using spies and espionage to learn its competitors' trade secrets to enhance its product and, as a result, win business from the competition:

> To support our sales efforts, we conduct a broad range of marketing

programs, including awareness advertising, client and industry-targeted solution campaigns, trade shows, including our PegaWorld iNspire user conference, solution seminars and webinars, industry analyst and press relations, web and digital marketing, community development, social media presence, ***and other direct and indirect marketing efforts.***

149.    On September 15, 2021, Pega participated in another conference call with investors and analysts as part of the Jefferies Software Conference. During the call, an analyst asked how Pega's new President of Global Client Engagement (Hayden Stafford)[31] was using Pega's "historical[]" sales "playbooks":

> No, that's great. ***And is [Hayden Stafford] driving new playbooks as well, or is he using some of the same playbooks that you've historically had and he's just refining some of those?***

In response, Defendant Stillwell stated:

> ***So we've done a lot of work on the playbooks over the last 3 or 4 years. I would say – I would characterize it as more refining the plays that we run and making sure that we have the right profile of the salesperson, the right level of enablement, and that we're targeting the right organizations with the right message, right?***
>
> Those – if you have really good salespeople that don't get enabled, that's a failure. If you have really good salespeople that are enabled, but they're on the wrong organizations that they want to buy your product, that's a failure. So it's a connection between those 3 pieces.

150.    These statements in were materially false and misleading when made. The true facts, which were then known to or recklessly disregarded by Defendants, included:

(a)    Rather than "compet[ing]" fairly and honestly in the BPM market, and "differentiat[ing]" itself from its competitors solely using legitimate means, as Defendants' statements indicated, Pega engaged in a far-reaching, malicious, and willful scheme to misappropriate Appian's trade secrets through various subterfuge, false pretenses, and other

---

[31] Hayden Stafford joined Pega on June 1, 2020, and reported to Defendant Trefler.

dishonest tactics, exposing Pega to substantial financial and reputational harm;

(b)    Pega's sales and marketing practices, including its "playbook" and "plays" for competing in the BPM market, included the use of paid agents, fake names, corporate fronts, and/or fictional companies to infiltrate the competition's software platforms, misappropriate its trade secrets, and use them to Pega's advantage;

(c)    Defendants' statements that Pega "shows very well competitively" and "compete[s] favorably due to our expertise" failed to disclose that, in fact, Pega owed its competitive success to espionage and a "war chest of materials" (PLT 248) – including sales and marketing aids, training materials, video footage, "technical" and "competitive briefs," and "kill points" – it amassed through misappropriating the competition's trade secrets and confidential information;

(d)    Defendants' representations that Pega was "best-in-class" and "credible," and possessed "credibility" in the BPM market, failed to disclose the fact Pega had engaged in a far-ranging, malicious, and willful scheme to misappropriate Appian's trade secrets;

(e)    Defendants' statements touting Pega's wins and success with public sector agencies such as the U.S. Census Bureau, failed to disclose that Pega had spied on the competition using fake names, corporate fronts, fictional companies, and other unethical and inappropriate devices, and then leveraged the misappropriated trade secrets and confidential information in order to win hundreds of contracts competing directly against Appian, including work with the U.S. Census Bureau;

(f)    Defendants' statements touting Pega's success and "credibility" with the U.S. Census Bureau and other government agencies were misleading in light of the fact that Pega concealed its misconduct from the U.S. government, including its collaboration with Zou; for instance, Schuerman admitted during the Virginia Action trial that "*I have never told anyone at*

*the federal government, to the best of my knowledge, about Mr. Zou*"; moreover, Pega had stacked its sales team for the U.S. Census Bureau deal with employees that had been involved in Pega's corporate espionage (including Leon Trefler, Bixby, and Bearden);

(g)     In order to differentiate Pegasystems' platform against its competitors, Pega had paid its employees cash bounties in exchange for helping Pega capture its competitors' confidential information;

(h)     Defendants' statements, including in the 2020 10-K, listing the ways Pega "support[ed] [its] sales efforts," failed to disclose that Pega's "broad range of marketing programs . . . [and] marketing efforts" included Pega's use of "spies," false pretenses, and other dishonest tactics to learn its competitors' trade secrets and confidential information; and

(i)     The statements failed to disclose the Virginia Action and potential loss exposure in the 2020 10-K the Company filed with the SEC violated GAAP and SEC disclosure regulations, specifically, Item 103 and ASC 450.

**B.     Misstatements and Omissions Regarding Pega's and its Competitors' Intellectual Property**

151.    On July 28, 2020 and October 28, 2020, Pega filed with the SEC Reports on Form 10-Q for the quarters ending June 30, 2020 and September 30, 2020 (respectively, the "2Q20 10-Q" and "3Q20 10-Q", and collectively the "2Q20 and 3Q20 10-Qs"). Defendant Stillwell signed the 2Q20 and 3Q20 10-Qs.

152.    As discussed above, Appian had sued Pega in May 2020 over its willful and malicious scheme to misappropriate Appian's trade secrets and confidential information.

153.    Pega's 2Q20 and 3Q20 10-Qs misleadingly failed to disclose the Virginia Action or Pega's egregious misappropriation of Appian's confidential information. Instead, the 2Q20 and 3Q20 10-Qs referred to, and thereby incorporated by reference, various statements in Pega's

Report on Form 10-K for fiscal year 2019 (the "2019 10-K"), misleadingly representing to investors that "intellectual property rights claims" against Pega "*could*" occur, while failing to disclose Pega had *already* engaged in a scheme to misappropriate Appian's intellectual property, had *already* been caught in the act by Appian, was *already* mired in litigation over its scheme, and *already* faced enormous financial and reputational risk as a result. The statements incorporated by reference into the 2Q20 and 3Q20 10-Qs included:

- "We *may* be subject to intellectual property rights claims by third parties, which are extremely costly to defend, *could* require us to pay significant damages, and *could* limit our ability to use certain technologies."

- "There can be *no assurance that third parties*, including clients, *will not claim infringement* by us with respect to current or future products."

- "*We expect* that software product developers *will increasingly be subject to infringement claims* as the number of products and competitors in our industry segment grows and the functionality of products in different industry segments overlaps. *Any such claims*, with or without merit, *could* be time-consuming, result in costly litigation, cause product shipment and delivery delays, require us to enter into royalty or licensing agreements, or be precluded from making and selling the infringing software, if such proprietary rights are found to be valid. These claims *could* also subject us to significant liability for damages, *potentially* including treble damages if we are found to have willfully infringed patents or copyrights."

- "We have received, and *may* in the future receive, *notices* that claim we have misappropriated, misused, or infringed other parties' intellectual property rights, and, to the extent we gain greater market visibility, *we face a higher risk of being the subject of intellectual property infringement claims.*"

154.    Significantly, Pega filed the 2019 10-K with the SEC on February 12, 2020 *– over three months before Appian filed the Virginia Action*. Moreover, the 2Q20 and 3Q20 10-Qs were filed months after the Virginia Action was filed. Accordingly, Defendants knew (or recklessly disregarded) that their statements in the 2Q20 and 3Q20 10-Qs were false and misleading and failed to disclose, inter alia: (i) that a core pillar of Pega's business strategy was to misappropriate Appian's trade secrets, (ii) the massive potential liabilities associated with such strategy or (iii)

that such liabilities were now squarely at issue in the Virginia Action.

155.    On February 17, 2021, Pega filed the 2020 10-K. The Individual Defendants signed the 2020 10-K.

156.    By February 2021, Pega had been buried in litigation against Appian for nearly nine months over Pega's egregious misappropriation of Appian's trade secrets and confidential information. Nevertheless, Defendants' 2020 10-K repeated the same false and misleading statements that pre-dated the Virginia Action that Defendants had incorporated into the 2Q20 and 3Q20 10-Qs, stating:

- "We *may* be subject to intellectual property rights claims by third parties, which are extremely costly to defend, *could* require us to pay significant damages, and *could* limit our ability to use certain technologies."

- "There can be no assurance *that third parties*, including clients, *will not claim infringement* by us with respect to current or future products."

- "*We expect* that software product developers *will increasingly be subject to infringement claims* as the number of products and competitors in our industry segment grows and the functionality of products in different industry segments overlaps. Any such claims, with or without merit, *could* be time-consuming, result in costly litigation, cause product shipment and delivery delays, require us to enter into royalty or licensing agreements, or be precluded from making and selling the infringing software, if such proprietary rights are found to be valid. These claims *could* also subject us to significant liability for damages, *potentially* including treble damages if we are found to have willfully infringed patents or copyrights."

- "We have received, and may in the future receive, *notices* that claim we have misappropriated, misused, or infringed other parties' intellectual property rights, and, to the extent we gain greater market visibility, *we face a higher risk of being the subject of intellectual property infringement claims.*"

157.    On April 28, July 28, and October 27, 2021, Pega filed Reports on Form 10-Q for the first, second, and third fiscal quarters of 2021 (respectively, the "1Q21 10-Q," "2Q21 10-Q," and "3Q21 10-Q"). These reports were signed by Defendant Stillwell.

158.    By the time Defendants filed these 10-Qs, Pega had been mired in litigation over

its misappropriation of trade secrets for anywhere between *10 and 16 months*. Indeed, by early 2021, Pega had *already* incurred heavy motion-practice losses against Appian in the Virginia Action, including failing to stay discovery and failing to compel non-public arbitration, and engaging in three days of mediation with Appian – in addition to producing voluminous incriminating documents and information relevant to its scheme. Moreover, by the last of these filings in late 2021, a merits trial was scheduled for only months away in early 2022.

159.    Nevertheless, Defendants continued to conceal the Virginia Action and the details of Pega's egregious scheme throughout 2021, and each of the 10-Qs for the first three quarters of 2021 incorporated by reference the same false and misleading statements in Pega's 2020 10-K, all of which pre-dated the Virginia Action.

160.    These statements were materially false and misleading when made. The true facts, which were then known to or recklessly disregarded by Defendants, included:

(a)    Defendants' statements that Pega "*may* be subject to intellectual property rights claims," "may in the future receive notices that claim we have misappropriated, misused, or infringed other parties' intellectual property rights," that "[t]here can be *no assurance* that third parties . . . will not claim infringement by [Pega]," and that "software product developers will increasingly be subject to infringement claims," failed to disclose the fact that Pega had *already* engaged in willful and malicious misappropriation of Appian's trade secrets and confidential information, was *already* snared in costly litigation against Appian since May 2020 over Appian's claims of trade secret misappropriation, and *already* faced meritorious claims that Pega's CEO and other officers had orchestrated and condoned Pega's scheme;

(b)    Defendants' statements that "intellectual property rights claims . . . *could* limit our ability to use certain technologies" misleadingly concealed the fact that (up until *November 2021*)

Appian threatened devastating injunctive relief arising from Pega's undisclosed scheme to misappropriate Appian's trade secrets, that would have prevented Pega from selling tainted software or relying on tainted sales processes, spelling potential doom for the Company;

(c)   Defendants failed to disclose that, in addition to misappropriating Appian's trade secrets through unauthorized access of its platform, Pega had engaged in similar conduct against other software companies including IBM, Salesforce, and ServiceNow; and

(d)   Defendants' failure to disclose the Virginia Action and potential loss exposure in the Forms 10-Q and Form 10-K the Company filed with the SEC violated GAAP and SEC disclosure regulations, specifically, Item 103 and ASC 450.

## C.   Misstatements and Omissions Regarding the Virginia Action and Appian's Claims Against Pega

161.   Defendants violated GAAP and SEC disclosure rules by failing to disclose Pega's egregious misconduct and potential loss exposure stemming from the Virginia Action. These violations rendered Pega's Forms 10-K and 10-Q filed between July 28, 2020 and October 27, 2021 materially false and misleading.

162.   On February 16, 2022, Pega filed the 2021 10-K signed by the Individual Defendants, belatedly disclosing the existence of the Virginia Action while falsely stating Appian's claims "***are without merit***," Pega has "***strong defenses to these claims***," and that "***any alleged damages claimed by Appian are not supported by the necessary legal standard***":

> **ITEM 3. LEGAL PROCEEDINGS**
>
> In addition to the matters below, the Company is, or may become, involved in a variety of claims, demands, suits, investigations, and proceedings that arise from time to time relating to matters incidental to the ordinary course of the Company's business, including actions with respect to contracts, intellectual property, employment, benefits, and securities matters. Regardless of the outcome, legal disputes can have a material effect on the Company because of defense and settlement costs, diversion of management

resources, and other factors.

. . .

### *Appian Corp. v. Pegasystems Inc. & Youyong Zou*

On May 29, 2020, Appian sued the Company and an individual, Youyong Zou, in the Circuit Court of Fairfax County, Virginia in a matter titled *Appian Corp. v. Pegasystems Inc. & Youyong Zou,* No. 2020-07216 (Fairfax Cty. Ct.). The complaint filed by Appian on May 29, 2020 (the "2020 Complaint") alleges that Mr. Zou was an employee of an Appian business partner, Serco Inc. ("Serco"); that, as a result, Mr. Zou had access to Appian trade secrets which Mr. Zou was required to keep confidential; and that in approximately 2013, while Mr. Zou was employed by Serco, the Company engaged Mr. Zou through an intermediary to provide the Company with Appian trade secrets and confidential information, which the Company is then claimed to have used to compete against Appian. The 2020 Complaint sets forth claims for misappropriation of trade secrets under the Virginia Uniform Trade Secrets Act, violation of the Virginia Computer Crimes Act, tortious interference with contract and business expectancy, and statutory and common law conspiracy. On July 24, 2020, the Company filed a plea in bar, seeking to have the claims asserted against the Company in the 2020 Complaint barred, in whole or in part, by the applicable statutes of limitations. Before the original plea in bar could be heard, Appian filed an amended complaint which the court allowed on November 4, 2021 (the "2021 Amended Complaint"), alleging that, in the 2019 time frame, employees of the Company accessed free Appian product trials under false pretenses. The 2021 Amended Complaint withdrew the claim for tortious interference with contract. After Appian filed the 2021 Amended Complaint, the Company successfully moved to dismiss Appian's conspiracy claims, which are no longer a part of the case. The Company also re-filed a plea in bar on November 29, 2021 seeking to have the claims asserted against the Company in the 2021 Amended Complaint barred, in whole or in part, by the applicable statutes of limitations. A jury hearing on the plea in bar commenced on January 31, 2022. On February 9, 2022, the judge determined that he could decide the plea in bar without the jury and, on February 10, 2022, the judge entered a verdict granting the relief sought by the Company's plea in bar motion with respect to the Virginia Computer Crimes Act, meaning the allegations asserted against the Company in the 2021 Amended Complaint with respect to the Virginia Computer Crimes Act are barred by the applicable statutes of limitations for conduct on or prior to May 29, 2015, while the claims made with respect to misappropriation of trade secrets under the Virginia Uniform Trade Secrets Act are not similarly barred. Appian's claim for tortious

interference with business expectancy was not a subject of the plea in bar. On February 11, 2022, the court allowed Appian's motion to further amend the 2021 Amended Complaint to assert a damages claim of approximately $3 billion, seeking all of the Company's revenues less estimated direct costs from the sale of all of the Company's products and services in the period from the fourth quarter of 2013 through the third quarter of 2021. Virginia law requires that the plaintiff establish proximate cause between any alleged use of the alleged trade secrets and damages incurred by the plaintiff, and also requires plaintiffs seeking damages to allege a specific damages amount, prohibiting recovery beyond that amount.

***In addition to disputing the validity of Appian's claims against the Company, the Company believes that any alleged damages claimed by Appian are not supported by the necessary legal standard of proximate cause.*** In addition, following the February 10, 2022 ruling on the Company's plea in bar, the ongoing claim under the Virginia Computer Crimes Act is time limited to acts occurring after May 29, 2015. A jury trial with respect to the merits of the dispute is scheduled to begin on March 21, 2022. ***The Company believes the claims brought by Appian against the Company are without merit, that the Company has strong defenses to these claims and that, among other things, even were the jury to find that the Company misappropriated Appian's alleged trade secrets, any alleged damages claimed by Appian are not supported by the necessary legal standard of proximate cause.*** The Company is unable to reasonably estimate possible damages or a range of possible damages given the Company's belief that the damages claimed by Appian fail to satisfy the required legal standard and due to the uncertainty as to how a jury may rule.

163.    On April 28, 2022, Pega filed the 1Q22 10-Q, signed by Defendant Stillwell,

stating:

As previously reported, the Company is a defendant in litigation brought by Appian that is currently being tried in Virginia (the "Court") titled *Appian Corp. v. Pegasystems Inc. & Youyong Zou*, No. 2020-07216 (Fairfax Cty. Ct.). The jury trial began on March 21, 2022. On April 13, 2022, Appian withdrew its claim against the Company for tortious interference with business expectancy. On that same day, in the course of making determinations on various motions, the Court stated that if the jury finds that the Company misappropriated information that constituted Appian trade secrets and finds that the Company incorporated those trade secrets into the Company's products or the Company's marketing materials, the burden will then shift to the Company to prove that the sales Appian seeks as

damages were not the result of the alleged misappropriation and use of the alleged trade secrets. This legal standard has not previously been adopted by the Virginia courts. ***The Company continues to believe that its sales of the products at issue were not caused by, or the result of, the alleged misappropriation of trade secrets, and is submitting evidence to the jury to that effect.*** The Company is unable to reasonably estimate possible damages because, among other things, of the uncertainty as to how a jury may decide and the parties' existing grounds for appeal based on rulings to date in the proceeding.

164.    The statements above were materially false and misleading when made. The true facts, which were then known to or recklessly disregarded by Defendants, included: Defendants knew that Appian's claims in the Virginia Action ***were meritorious***, and were supported by voluminous evidence; indeed, Pega was in possession and aware of the very same mountain of evidence of its own misconduct that a Virginia jury, trial court, and appellate court all concluded supported a finding of liability against Pega;

(a)    For example, Defendants knew that: (i) Pega had hired a spy (Zou) to help Pega misappropriate Appian's trade secrets and confidential information; (ii) Pega's employees also accessed Appian's platform using false pretenses, fake names, fake or front companies, and other inappropriate means; and (iii) Pega created various internal documents and video footage based on its illicit access to Appian's platform, and used that information to snatch Appian's business and improve Pega's software;

(b)    Likewise, Defendants knew that Appian's "claim[s]" and "alleg[ations]" – which Defendants purported to identify in the 2021 10-K as "without merit" and for which Pega has "strong defenses to these claims" – were, in reality, factually supported; Defendants knew, for instance, that Zou ***in fact*** "had access to Appian trade secrets," Pega ***in fact*** "engaged Mr. Zou through an intermediary to provide the Company with Appian trade secrets and confidential information," Pega ***in fact*** "used [Appian's information] to compete against Appian," and

"employees of the Company" in fact "accessed free Appian product trials under false pretenses";

(c)    Defendants also knew that Pega acted willfully and maliciously in misappropriating Appian's trade secrets and confidential information; Pega's officers and employees were determined to use Appian's misappropriated information to, *inter alia*, "destroy[] Appian," "set . . . traps" for Appian, "torpedo appian," develop "attack materials" for use against Appian, "blow . . . up" Appian's business, "steal" deals from Appian, and "mak[e] [Appian] go away for good";

(d)    Defendants knew Appian's claimed damages were well supported, including by lay testimony, expert testimony, and Pega's own internal documents and data; indeed, for years, Pega used Appian's trade secrets and confidential information to compete against Appian and improve Pega's own software, and, faced with overwhelming evidence that Pega leveraged Appian's trade secrets to improve Pega's product (and ***with over $3 billion in damages on the line***), Pega's own expert (i) "***accept[ed] the premise that all of Pega's sales [from 4Q13 to 3Q21] are a result of the product improvement***" and (ii) conceded that Appian's damages from the 201 opportunities for which Appian and Pega directly competed were upwards of $187 million if Pega was found to have misappropriated Appian's trade secrets; and

(e)    Defendant Trefler knew of the conduct at issue as a result of his direct participation in the scheme.

### D.    Misstatements and Omissions Regarding Pega's Code and Compliance with Ethical and Legal Guidelines

165.    Pega's 2020 and 2021 10-Ks assured investors Pega had "adopted a written code of conduct that applies to our Board of Directors and employees, including our principal executive officer, principal financial officer, principal accounting officer, and persons performing similar functions."

166.    Pega's Code was publicly available on Pega's website during the Relevant Period.

60

Indeed, **Defendants specifically directed investors to Pega's Code**, stating in Pega's 2020 and 2021 10-Ks that "[a] copy of our code of conduct can be found on our website, www.pega.com," and that "[o]ur Code of Conduct is available on our website in the 'Governance' section."

167.    Pega made very specific statements in its Code that falsely indicated to investors the Company complied with ethical and legal standards and that its officers and directors helped ensure compliance by others at Pega.

168.    For instance, Pega stated: "This Code applies to **all our interactions** in various areas of our shared professional lives **including those of our officers, full and part-time employees**, interns, all people retained as independent consultants, and members of the Board of Directors of Pega and its subsidiaries worldwide."

169.    Pega also stated in the Code that it is "commit[ted]" to "**[c]ompete fairly, honestly**, and vigorously," and "[m]aintain a culture that values and nurtures **ethical conduct** and fosters **transparency and honesty** by being fair and trustworthy in all our interactions with each other, our clients, and our partners."

170.    Pega included specific statements in its Code regarding Pega's treatment of its competitors' confidential information. For instance, Pega stated its "policy is to **protect the confidential information of third parties with the same care that we use to protect our own** confidential information."

171.    Pega also assured the investing public that Pega would "**[n]ever use illegal or questionable means to acquire a competitor's trade secrets or other confidential information,** such as trespassing, burglary, wiretapping, bribery, stealing, seeking confidential information from a new employee who recently worked for a competitor, **or misrepresenting your identity in hopes of obtaining confidential information.**"

172.    Pega also assured investors that the Company's Chairman, founder, and CEO – Defendant Trefler – was one of Pega's moral compasses. For instance, in a section of the Code titled "Compliance with the Code: If Issues or Questions Arise," Defendants assured investors that "*[i]f any of [Pegasystems' employees] are asked to depart from this Code, whether by our supervisor, another employee or anyone else, we agree to seek clarification and/or guidance as to the propriety of the actions in question from our Chief Executive Officer* or our Chief Compliance Officer."

173.    Pega also assured investors that Pega "will not tolerate any deviation from our Code," and that it would "take prompt action to enforce this Code and all of Pega's other policies. Depending on the seriousness of the violation and the other relevant circumstances, violations of this Code may result in a formal or informal warning or reprimand, demotion, suspension, dismissal, or other disciplinary action."

174.    Furthermore, Pega also assured investors "*any supervisor who directs or approves* of any conduct in violation of this Code, *or who has knowledge* of such conduct and does not immediately report it, *also will be subject to disciplinary action*, which may include suspension or termination of employment."

175.    These statements in were materially false and misleading when made. The true facts, which were then known or recklessly disregarded by Defendants, included:

(a)    Rather than "[c]ompete fairly, [and] honestly," and "protect the confidential information of third parties," Pega regularly and knowingly competed unfairly and dishonestly by engaging in a far-ranging, malicious, and willful scheme, since as early as 2012, to misappropriate Appian's trade secrets through various dishonest tactics, subterfuge, and false pretenses, exposing Pega to reputational harm and billions of dollars in;

(b)    Several of Pega's officers and employees (as well as "independent consultants" hired by Pega) employed and/or knew their colleagues employed "illegal or questionable means to acquire a competitor's trade secrets or other confidential information," including collaborating with spies such as Zou to misappropriate Appian's trade secrets, and using fake names, corporate fronts, fictional companies, and other unethical and inappropriate means; Pega's employees had also "misrepresent[ed] [their] identify in hopes of obtaining confidential information," including, but not limited to, Defendant Trefler (posing as "Albert Scii, "A. Ewe," and "Paul Foon"), Baril (posing as "Andrew Powers" and "Emily Gold"), Fine, Le, Bessman, Potluri, and Sarada;

(c)    Defendant Trefler, whom Pega assured investors was responsible for providing "clarification and/or guidance as to the propriety of" employees' actions, in reality orchestrated Pega's misconduct; unbeknownst to investors, Trefler knew (or recklessly disregarded) that he and his employees repeatedly violated ethical guidelines and the law by, *inter alia*, using fake names and aliases (as well as fake companies and corporate fronts) to infiltrate and misappropriate Appian's confidential information; moreover, Trefler's direct participation in (and knowledge of) Pega's egregious misconduct (including Project Crush and other teardown efforts) saddled him with an insurmountable conflict of interest, precluding Trefler from offering objective "clarification and/or guidance" with respect to his employees' misconduct regarding Appian;

(d)    Pega's officers were unwilling or unable to seek Trefler's and/or the Chief Compliance Officer's "clarification and/or guidance as to the propriety of" Pega's conduct; for instance, on or about October 17, 2019, Baril questioned the "legality" of Pega's conduct and asked his direct supervisor – Schuerman (Pega's CTO) – who Baril "***can ping about the legality of using the [Appian's] system.***" Schuerman – who knew Pega's CEO was behind Pega's "teardown" of Appian's system – failed to refer Baril to Pega's CEO or Chief Compliance Officer, and instead

directed Baril to proceed with Pega's illicit conduct; and

(e)    Pega's management failed to discipline employees that knew of or participated in Pega's scheme, in essence neutering Pega's Code; for instance, not only did Pega continue to employ, and even ***promote***, employees who participated in Pega's misappropriation of Appian's trade secrets, it paid bounties to employees who successfully obtained competitors' information, including, for example, as recently as their late 2021 or early 2022 depositions in the Virginia Action, Pega continued to employ Defendant Trefler, Akgonul, Schuerman, Bixby, Leon Trefler, Baril, Bessman, and Potluri; Pega also allowed its employees to continue spying on Appian and using Appian's trade secrets to win business during the Relevant Period.

### E.    False and Misleading Sarbanes-Oxley Certifications

176.    Each of the Forms 10-K and 10-Q issued during the Relevant Period included signed certifications by the Individual Defendants.

177.    The Individual Defendants executed their Relevant Period certifications pursuant to Sarbanes Oxley ("SOX"), certifying in each that, *inter alia*:

(a)    "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; and

(b)    "Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

178.    As alleged herein, at the time the Individual Defendants executed their Relevant Period SOX Certifications, Defendants knew or recklessly disregarded facts indicating the

statements in their SOX Certifications were materially misleading, including that:

(a)     Pega's Forms 10-K and 10-Q did contain material misstatements and omissions of

material facts; and

(b)     Pega filed false financial statements during the Relevant Period.

## VI.    PEGA'S FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED IN VIOLATION OF GAAP AND SEC DISCLOSURE RULES

179.    As detailed herein, Defendants concealed their misconduct and made material

misstatements and omissions regarding the existence and potential loss exposure from the Virginia

Action. As a result of their misconduct and violations, Pega filed false financial statements during

the Relevant Period.[32] These financial statements were materially misstated and in violation of

GAAP[33] and SEC disclosure rules for the following reasons:

(a)     Pega failed to disclose the Virginia Action as a material legal proceeding in

violation of SEC Regulation S-K, Item 103; and

(b)     Pega failed to disclose the Virginia Action as a loss contingency in its financial

statements in violation of GAAP.

### A.    Defendants Failed to Disclose Loss Contingencies and Legal Proceedings in Violation of GAAP and SEC Disclosure Rules

180.    During the Relevant Period, Pega concealed the existence of its egregious

_____

[32] Pega's false financial statements filed with the SEC during the Relevant Period included: Forms 10- Q filed on July 28, 2020, October 28, 2020, April 28, 2021, July 28, 2021, and October 27, 2021; and Form 10-K filed on February 17, 2021.

[33] GAAP constitutes those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the FASB. The FASB's promulgated standards are generally contained within the ASC, which are considered to be the highest standards of GAAP. SEC Regulation S-X, Rule 4-01, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

misconduct and potential loss exposure related to the Virginia Action. As discussed above, Appian initiated the Virginia Action on May 29, 2020, asserting damning allegations that Pega misappropriated Appian's trade secrets and confidential information, through the use of a "spy" employee (Zou) in order to steal business from Appian.

181.    Appian also alleged that Pega had conspired with others besides Zou to misappropriate Appian's trade secrets, and had done so "as recently as [2019]." Critically, Appian alleged Pega's scheme "[i]nvolv[ed] personnel at Pegasystems up to and including Pegasystem's CEO and Founder, Alan Trefler, and other senior Pegasystems executives." Further, Appian's May 2020 Complaint sought assorted relief, including actual damages, unjust enrichment (including "a disgorgement of all profits"), attorney's fees, costs, punitive damages, treble damages, and severe injunctive relief against Pega.

182.    Notwithstanding the filing of the Virginia Action in May 2020, and Appian's material damages and well-founded and documented allegations (which Defendant Trefler knew were true based on his personal involvement in Project Crush and other teardown efforts), Pega concealed the lawsuit from investors for almost two years. On February 16, 2022, with a jury trial fast approaching, Pega finally publicly disclosed the lawsuit and the fact Pega faced up to $3 billion in damages for its misconduct.

183.    Pega's failure to disclose the Virginia Action and any related potential loss exposures in its Relevant Period financial statements violated GAAP and SEC disclosure rules. As set forth in the chart below, Pega failed to make these required GAAP and SEC disclosures in each of the following Forms 10-Q and Form 10-K:

|  | Item 103 Reg. S-K: "Legal Proceedings" | ASC 450: footnotes to the financial statements |
|---|---|---|
| **Form 10-Q** <br> *filed on July 28, 2020* | *none* | *none* |

| **Form 10-Q**<br>*filed on October 28, 2020* | *none* | *none* |
|---|---|---|
| **Form 10-K**<br>*filed on February 17, 2021* | *none* | *none* |
| **Form 10-Q**<br>*filed on April 28, 2021* | *none* | *none* |
| **Form 10-Q**<br>*filed on July 28, 2021* | *none* | *none* |
| **Form 10-Q**<br>*filed on October 27, 2021* | *none* | *none* |

### 1.    Item 103: Legal Proceedings

184.    Pega's failure to disclose the Virginia Action by no later than the filing of Pega's

2Q20 10-Q was in direct violation of Item 103, which requires disclosure of any material pending

legal proceedings:

> ***Describe briefly any material pending legal proceedings, other
> than ordinary routine litigation incidental to the business***, to which
> the registrant or any of its subsidiaries is a party or of which any of
> their property is the subject. Include the name of the court or agency
> in which the proceedings are pending, the date instituted, the
> principal parties thereto, a description of the factual basis alleged to
> underlie the proceedings and the relief sought.

17 C.F.R. §229.103(a).

185.    Accordingly, Item 103 required Defendants to disclose the Virginia Action because

it qualified as a material legal proceeding outside "ordinary routine litigation incidental to [Pega's]

business."

186.    Instead, however, Pega failed to disclose the Virginia Action, as well as the fact

that Pega's corresponding legal expenses increased significantly in 2021 due to proceedings

outside the ordinary course of business, until it filed its 2021 10-K on February 16, 2022. In

belatedly disclosing the litigation, Pega admitted in the 2021 10-K that the increased legal expenses

Pega incurred "in 2021" from the Virginia Action were not due to ordinary routine litigation

incidental to the business, but rather arose ***outside the ordinary course of business***:

> The increase in general and administrative [expenses] in 2021 was primarily due to an increase of $14.4 million in legal fees and related expenses *arising from proceedings that originated outside of the ordinary course of business.* We have incurred and expect to continue to incur additional expenses for these proceedings in 2022.

187.    Similarly, Pega also disclosed in its 2021 10-K that Pega's "change in cash" in 2021 was negatively impacted by "$18.2 million in legal fees and related expenses arising from proceedings that originated *outside the ordinary course of business*. . . . *See* 'Note 19. Commitments and Contingencies' in Item 8 of this Annual Report for additional information." Pega's financial statement footnote 19 disclosed the Virginia Action for the first time.

188.    By Defendants' own admissions, the increase in legal fees and related expenses Pega incurred during fiscal year 2021, including those arising from the Virginia Action, were outside the ordinary course of business and *were not incidental*. As such, Item 103 required disclosure of the Virginia Action by no later than the filing of Pega's 2Q20 10-Q.

189.    Indeed, as opposed to being "ordinary" and "routine," the Virginia Action featured *extraordinary* allegations that a publicly traded company's CEO and Board Chairman, as well as other senior officers, had orchestrated a nearly decade-long scheme to misappropriate a primary competitor's information using spies and other subterfuge. Given these facts, under no reasonable circumstances was the Virginia Action "ordinary" or "routine" litigation, and Item 103 required its disclosure by no later than the filing of Pega's 2Q20 10-Q.

190.    Additional reasons detailed below further demonstrate the Virginia Action was clearly a "material pending legal proceeding" that Defendants were required to disclose. For example, the Virginia Action surpassed Item 103's quantitative materiality threshold, requiring its disclosure. The SEC provides a quantitative threshold in Item 103, according to which legal proceedings involving a claim for damages are considered material and must be disclosed if the

amount involved exceeds 10% of the current assets of the registrant. 17 C.F.R. §229.103(b)(2).

191.    As shown in the table below, Pega's reported then-current assets during the Relevant Period ranged from approximately $804 million to $977 million:

| Quarter | Current Assets |
|---|---|
| June 30, 2020 (2Q20) | $969,939,000 |
| September 30, 2020 (3Q20) | $904,210,000 |
| December 31, 2020 (4Q20) | $976,910,000 |
| March 31, 2021 (1Q21) | $922,153,000 |
| June 30, 2021 (2Q21) | $910,229,000 |
| September 30, 2021 (3Q21) | $828,886,000 |
| December 31, 2021 (4Q21) | $840,218,000 |
| March 31, 2022 (1Q22) | $803,813,000 |

192.    Pega's potential damages from the Virginia Action significantly exceeded Item 103's 10% threshold in each quarter throughout the Relevant Period. The May 2020 Complaint alleged six separate causes of action, including under the VUTSA and VCCA. With respect to its VUTSA claim, Appian alleged it "suffered and will suffer substantial monetary damages in an amount that *will exceed $90 million*."[34] Appian further alleged under its VUTSA count that "*[i]n addition* to the actual losses caused Appian by Zou's and Pegasystem's misappropriation, *Defendants have been unjustly enriched* by the misappropriation. Appian is entitled to an award of damages for the misappropriation, *including for both* the *actual loss* caused by the

---

[34] May 2020 Complaint ¶ 54. With respect to four other counts in its May 2020 Complaint, Appian also alleged it has suffered or will suffer monetary damages "in an amount that will exceed $90 million."

misappropriation and the unjust enrichment caused by the misappropriation."[35]

193.    Appian's May 2020 Complaint's "Request for Relief" also specifically included "compensatory damages Appian proves at trial either in the form of *actual damages, unjust enrichment including a disgorgement of all profits, or both*." Appian's May 2020 Complaint also sought: (i) punitive damages; (ii) treble damages; (iii) attorney's fees; and (iv) other and further relief.

194.    Given their involvement in and knowledge of the wrongdoing at issue, Defendants knew that Appian's claims exposed Pega to strong claims for billions of dollars of liability. As Appian alleged, Pega's scheme had persisted for *at least seven years* – "beginning in January 2013, *and possibly earlier*" to "*as recently as [2019]*" – during which Pega made *billions* of dollars in profits while misappropriating and exploiting Appian's information, profits Appian sought to disgorge.

195.    Pega also knew from the scope of discovery in the Virginia Action that Appian's claims exposed Pega to billions of dollars of liability. For instance, the trial court held on multiple occasions that the relevant time period for discovery extended from 2012 into 2020, including on or about December 21, 2020, when the court granted Appian's motion to compel Pega to employ an ESI document protocol to search for documents from 2012 through May 29, 2020 (the date the Virginia Action was filed). Meanwhile, Appian propounded comprehensive fact discovery on Pega corresponding to *over eight years of Pega's profits*. For instance, in December 2020, Appian sent Pega interrogatories seeking Pega's profits on sales made between "January 1, 2012 to the Present." Appian also identified for Pega an extensive list of customers for which the two companies had directly competed over the years. Appian sent additional discovery in early 2021,

---

[35] May 2020 Complaint ¶ 55.

seeking Pega's documents showing its revenues and profits from sales dating back to January 1, 2012. Appian propounded further discovery in 2021, seeking information regarding all revenues Pega had received (as well as the costs and expenses Pega had incurred in order to realize those revenues) during the period from 2013 through 2021. In light of these and other circumstances, Defendants understood that billions of dollars of Pega's profits were at issue in the Virginia Action.

196.    Using the parties' substantial damages discovery, Appian presented the jury with two main damages figures quantifying Pega's profits from its scheme. First, Appian presented evidence that Pega realized approximately $1.417 billion in revenue, and approximately *$479 million in profits*, from 201 opportunities for which Pega had directly competed and won against Appian from 4Q13 to 3Q21 (Pega's "Direct Competition" profits). Second, Appian presented evidence that, from 4Q13 to 3Q21, Pega had realized approximately $6.63 billion in revenues and *$3 billion in profits* tainted by product improvements Pega made using Appian's trade secrets (Pega's "Product Improvement" profits).

197.    Notably, with over *$3 billion dollars* of Pega's profits on the line, Pega's damages expert "accept[ed] the premise that all of [Pega's] sales [from 4Q13 to 3Q21] are a result of the product improvement."[36] Thus, rather than take the opportunity to show that some material portion of Pega's sales during that time period were wholly untainted by misappropriation, Pega's expert simply "accept[ed] the premise" that *eight years of software sales had been tainted by misappropriation*.[37]

---

[36] As Pega's damages expert testified: "I think implicit in what I've calculated is *I'm accepting the premise that all of the sales are a result of the product improvement totaling 6, $7 billion*. What I've -- what I disagree -- I just accepted that premise. I don't know if that's true or not. I've accepted that as the underlying premise of the calculation." 5/3/22 Trial Tr. at 7508:23-7509:07.

[37] Pega's damages expert testified that, for purposes of his damages analysis, Pega employees he spoke with included Defendant Stillwell, Schuerman, Pega's Vice President of Global Commercial Strategy, and Pega's Senior Director of Business Operations.

198.    Moreover, Pega's expert also conceded that Appian's damages from the 201 opportunities for which Appian and Pega directly competed from 4Q13 to 3Q21 were $187 million if Pega was found to have misappropriated Appian's trade secrets.[38] That figure was between 19.1% and 23.3% of Pega's current assets during the Relevant Period – far in excess of Item 103's 10% threshold described above.

199.    After closing arguments on May 5, 2022, the jury swiftly concluded that **_billions of dollars_** of Pega's profits had in fact been wrongfully obtained as a result of Pega's scheme, awarding Appian $2,036,860,045 in unjust enrichment damages (before interest and attorney's fees).

200.    Defendants also knew from their own access to Pega's internal company records, first-hand employee accounts, and knowledge of the scheme, that Pega had in fact misappropriated and ubiquitously utilized Appian's trade secrets, tainting Pega's profits for years. Pega possessed voluminous data and information that indicated it had realized billions of dollars in profits while employing its scheme, including data quantifying Pega's revenues and profits each quarter and year, as well as data Pega maintained identifying the deals on which it directly competed against Appian.

201.    The fact that Pega employees routinely commented to one another that they were competing against Appian on specific deals provides further indicia that Pega closely monitored when and where it went up against Appian. For example, in a competition against Appian over Bank of America, Pega internally admitted it was "in the fight of our lives at the bank with Appian." PLT 50. Another Pega employee remarked internally about how Pega had "used a lot of

---

[38] Counsel for Appian: "So to be clear, your opinion for this jury, assuming liability, is that instead of awarding the $479 million in unjust enrichment damages that Mr. Malackowski [Appian's expert] calculates, **_they should instead award Appian $187 million in unjust enrichment damages, right?_**" Pega's expert: "**_As I said, no more than that_** . . . ." 5/4/22 Trial Tr. at 7581-82.

this material recently on a significant opportunity where we've been head to head against Appian."

202.    With respect to Appian's request for attorney's fees, the VUTSA provides for "reasonable attorneys' fees to the prevailing party" where the misappropriation is "willful and malicious." Va. Code §59.1-338.1. Under Virginia law, prevailing parties following a judgment are also entitled to seek costs, as well as post-judgment interest at the rate of 6% per annum (computed from the date the jury issues its verdict). Va. Code §§17.1-601, 18.2-152.12(A).

203.    Defendants knew (or recklessly disregarded) that Pega had acted willfully and maliciously in misappropriating Appian's trade secrets, and that post-judgement interest and Appian's attorney's fees could reach into the tens of millions or more, adding to Pega's exposure from the litigation. Pega itself incurred millions in attorney's fees in connection with the Virginia Action. Indeed, on June 8, 2022, Appian moved to recover approximately $22.6 million in attorney's fees, over $4.2 million in costs, and an award of post-judgment interest at 6% per annum. On September 16, 2022, the court in the Virginia Action granted Appian over $23.6 million in attorney's fees and costs, as well as post-judgment interest at an annual rate of 6%, or approximately $122 million per year.

204.    In light of the above, Pega's failure to disclose the Virginia Action prior to February 16, 2022 violated Item 103 and rendered Pega's filings materially false and misleading.

## 2.    ASC 450: Disclosure of Loss Contingencies

205.    Pega also failed to disclose the Virginia Action as a loss contingency in its financial statements in violation of GAAP. ASC 450 is the relevant GAAP pronouncement addressing "loss contingencies." Notably, the SEC staff has emphasized to registrants that Item 103 and ASC 450 have different requirements and objectives and should be approached separately to ensure

compliance.[39]

206.     As defined in ASC 450, a loss contingency is an existing condition, situation, or set of circumstances involving uncertainty as to a possible loss that will be resolved when one or more future events occurs or fails to occur. ASC 450-20-20. One type of loss contingency identified in ASC 450, among others, includes pending or threatened litigation, such as the Virginia Action. ASC 450-20-05-10.

207.     As explained below in ASC 450, when a loss contingency exists, the likelihood that a future event or events will confirm the loss or impairment of an asset or the incurrence of a liability ranges from "probable" to "remote":

> When a loss contingency exists, the likelihood that the future event or events will confirm the loss or impairment of an asset or the incurrence of a liability can range from probable to remote. As indicated in the definition of contingency the term loss is used for convenience to include many charges against income that are commonly referred to as expenses and others that are commonly referred to as losses. The Contingencies Topic uses the terms probable, reasonably possible, and remote to identify three areas within that range.

ASC 450-20-25-1.

208.     GAAP defines the following terms to identify and evaluate accounting conditions within that range:

(a)     **Probable** – "[t]he future event or events are likely to occur" (ASC 450-20-20);

(b)     **Reasonably Possible** – "[t]he chance of the future event or events occurring is more than remote but less than likely" (*id*.); and

---

[39] *AICPA National Conference on Current SEC & PCAOB Developments* (Dec. 2010). Therefore, the statutory requirements that govern SEC Regulation S-K disclosures are independent of the requirement to file financial statements that are in compliance with GAAP. Stressing the importance of this concept, the SEC staff has noted that management needs to "take back the financial statements" (to provide the disclosures required by GAAP) from the lawyers who may want to restrict litigation disclosures.

(c)    *Remote* – "[t]he chance of the future event or events occurring is slight" (*id.*).

209.    An accrual for a loss contingency (*i.e.*, a reserve or liability) and related loss provision (*i.e.*, charge to income or expense) must be made when both of the following conditions are met:

> a.    Information available before the financial statements are issued or are available to be issued . . . indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements[; and]
>
> b.    The amount of loss can be reasonably estimated.

ASC 450-20-25-2.

210.    Meanwhile, under ASC 450, disclosing a loss contingency in the footnotes to the financial statements is *required* when there is more than a remote chance that a loss will be incurred (even in the event that a reliable estimate of eventual losses cannot be made at the time). ASC 450- 20-50-3.

211.    The threshold for disclosure of a loss contingency (as opposed to the higher threshold for the accrual of a loss contingency) is very low – GAAP requires disclosure if "***[t]he chance of the future event or events occurring is more than remote but less than likely***" (*i.e.* "[r]easonably [p]ossible"). ASC 450-20-20. Under ASC 450, the disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made. ASC 450-20-50-4.

212.    ASC 450 also provides implementation guidance specifically addressing the accrual and disclosure requirements for "Litigation, Claims, and Assessments." For example, three factors which must be considered for assessing whether accrual and/or disclosure is required with respect to pending or threatened litigation include:

> a.    The period in which the underlying cause (that is, the cause for

action) of the pending or threatened litigation or of the actual or possible claim or assessment occurred[;]

b.      The degree of probability of an unfavorable outcome[; and]

c.      The ability to make a reasonable estimate of the amount of loss.

ASC 450-20-55-10.

213.    For example, the following factors demonstrate that Defendants knew, or recklessly disregarded, that their misconduct evidenced that an unfavorable outcome and material loss was probable (or at a bare minimum at least "reasonably possible") requiring disclosure to investors throughout the Relevant Period:

(a)      Rather than compete fairly and lawfully against Appian, beginning as early as 2012, Pega secretly employed a scheme to misappropriate Appian's trade secrets and other confidential information; Pega then weaponized this valuable information to train its salesforce to effectively compete against Appian, to create internal sales and intelligence materials for use in "head-to-head" competitions against Appian, and to improve Pega's own product using Appian's proprietary information;

(b)      To execute its scheme to "destroy[] Appian," Pega secretly paid Zou (through the use of a third party staffing firm) and referred to Zou internally as a "spy," "Matt" or "'the other Matt'"; Zou worked extensively with Pega to misappropriate Appian's trade secrets, during which he created videos of himself accessing Appian's platform, covertly downloaded volumes of Appian's software documentation for Pega, showcased for Pega the functionality of the Appian platform, provided Pega with confidential information regarding the strengths and limitations of Appian's software, showed Pega how to use and navigate Appian's platform, and answered Pega's detailed technical questions about Appian's platform;

(c)      Pega took extreme measures to misappropriate Appian's confidential trade secrets,

including, for example, using false pretenses and false names to gain access to Appian's software; one employee (Baril) concocted multiple "personas" and a fake consulting firm to access Appian's information, and other employees (Fine and Le) obtained Appian login credentials by falsely posing as "customers" using their spouses' businesses as fronts; moreover, Defendant Trefler himself concocted aliases in order to obtain Appian's information, including "Albert Scii," "A. Ewe," and "Paul Foon";

(d)    Pega had perpetrated a scheme to misappropriate Appian's trade secrets, which was not only known to, but carried out through, the personal involvement of the Company's CEO, Defendant Trefler, who had, among other things, personally attended a meeting with the "spy," and received Appian's trade secrets supplied by the "spy"; during the trial, Trefler admitted that it was "not inappropriate" for Pega to have hired the contractor and that the Pega employees who gained access to Appian trial software "shouldn't have done it";

(e)    During the course of the Virginia Action, Pega suffered one setback after another: multiple motions to send the lawsuit to arbitration were denied; motions Appian filed to amend their complaint to add new allegations (which were opposed by Pega) were granted; and Pega repeatedly lost discovery fights.[40] Pega even carried out egregious discovery abuses, including providing false interrogatory responses and deposition testimony, withholding damning evidence of Pega's misconduct, and altering Pega's internal documents. Pega's discovery and other motion practice losses piled up in the Virginia Action and its efforts to quietly dispel Appian's claims were unsuccessful;

(f)    Appian's May 2020 Complaint involved material damage claims against Pega,

---

[40] In granting leave to amend, and rejecting Pega's argument that it would be prejudiced by Appian's amendment, the court in the Virginia Action emphasized that Pega's own documents provided Pega with "knowledge of the relevant facts" underlying Appian's liability and damages allegations.

implicating billions of dollars of Pega's tainted profits; and

(g)    Throughout the Relevant Period, Defendants knew, or recklessly disregarded, from Pega's own egregious misconduct that an "unfavorable outcome" in the Virginia Action was likely (*i.e.*, "probable") because Defendants knew that the allegations that Pega willfully and maliciously misappropriated Appian's trade secrets were true. Consequently, Pega knew, or recklessly disregarded, the likelihood that a material loss being incurred from the Virginia Action was more than remote, and therefore Defendants were required to disclose to investors the nature of the lawsuit and any potential loss exposure. *See* ASC 450-20-50-4.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

### A.    Defendants Intentionally Concealed from Investors Evidence of Defendants' Scheme to Misappropriate Appian's Trade Secrets

214.    As alleged herein, leading up to and during the Relevant Period, Defendants concealed Pega's misappropriation of Appian's trade secrets from the investing public. Defendants knew their egregious conduct, if publicly revealed, would expose Pega to significant financial and reputational harm. Defendants' concerted efforts to hide their willful and malicious misconduct from the public is strongly indicative of scienter.

215.    For instance, rather than search for Zou itself in 2012, to avoid public detection, Pega secretly engaged a third party to identify and recruit "an Appian Developer" who was not "loyal" to Appian. PLT 4; PLT 180. Pega also funneled Zou's payments through the third party, to further prevent Pega from being linked to Zou.

216.    Pega also concealed Zou's true identify from all but a select group of senior Pega employees, and therefore most Pega employees knew Zou as "Matt," "the other Matt," or the "independent consultant." PLT 377; PLT 223. As a further step to conceal its connection to Zou, Pega altered internal records to "remove Youyong's name" from them. PLT 733.

217.    Pega also took steps to limit the recipients of materials and video footage Pega created featuring images of Appian's platform. For example, Baril cautioned various Pega employees on December 4, 2019, that video footage Pega had captured of Appian's platform "***are STRICTLY INTERNAL***." PLT 761. In September 2019, in emailing an hour-long video Pega had captured of Appian's platform, Pega's Director of Data & Integration (Barak) cautioned: "***[T]he situation between u[s] and Appian is apparently a bit sensitive right now, so please be judicial in sharing this***." PLT 624.

218.    Meanwhile, Schuerman testified at trial that, in his "client-facing role" as CTO, he never disclosed to other companies Pega's work with Zou:

> Q.    When you meet with these clients or prospective clients, the chief technology officers and the chief information officers of other companies, when you met with them, you have never told them anything about Pegasystems' hiring of Mr. Zou, have you?
>
> . . .
>
> A.    I don't believe I have, no.
>
> Q.    You haven't told them anything about the interactions that you had with Mr. Zou, have you?
>
> A.    I probably have not, no.
> . . .
>
> Q.    You haven't told them, sir, that the documents used by your solutions consultants, the technical brief, the competitive business brief, that these documents contain information that was provided to Pegasystems by Mr. Zou, have you?
>
> A.    No.
>
> Q.    You haven't told them that these documents contain information provided to Pegasystems by Mr. Zou that was not previously available to Pegasystems, have you?
>
> A.    Probably not, no.[41]

---

[41] 4/28/22 Trial Tr. at 6500:09-6501:23.

219.    Schuerman also admitted at trial that in all of his "interact[ions] with the federal government agencies to whom Pega sells its platform to," **he has "never told anyone at the federal government, to the best of my knowledge, about Mr. Zou.**" 4/28/22 Trial Tr. at 6502:14-17, 6504:14-16. Schuerman's admission regarding Pega's complete lack of candor with federal government agencies is striking considering Pega had emphasized to investors Pega's "credibility" with the "clearly immense" government sector.[42]

220.    As described herein, various Pega employees used fake names and fake or front companies to conceal evidence of their espionage. Meanwhile, Defendant Trefler employed his own "personas" – including "Albert Scii," "A. Ewe," and "Paul Foon" – to mask his efforts to access Appian's information. For example, to avoid detection by Appian, Trefler registered with Appian using his personal email address asciizero@gmail.com, instead of his Pega email address, and identified himself to Appian as "**Paul Foon," a "[g]rocery stores" company**. PLT 766. Trefler also admitted he may have attempted to register for an Appian forum as "Albert Skii," using the fictional company "SA Zero Mines." PLT 768.

221.    Pega also concealed its conduct during the Relevant Period by withholding incriminating details in response to Appian's discovery requests. Appian confronted Schuerman with one such example (Appian's Interrogatory No. 13) during the 2022 trial:[43]

>   Q.    You didn't say anything in [Pega's] response [to Appian's Interrogatory No. 13] here, anything about Alan Trefler watching any videos of Appian's platform, did you?
>
>   . . .

---

[42] For example, on April 28, 2022, Defendant Stillwell publicly described the "public sector" vertical as "clearly immense" and "large for automation and certainly platform companies like Pega."

[43] Appian' Interrogatory No. 13 (propounded in December 2020) asked Pega to "[i]dentify every Pegasystems employee who has accessed or viewed someone else accessing the Appian platform or documentation from January 1, 2012 to the present."

A.     I did not.

Q.     You didn't say anything in here about Mayran Snir Barak, the product manager with whom Mr. Baril had shared the video he had recorded, you didn't say anything in here about her watching, accessing the Appian's platform, right?

A.     No.

Q.     ***Yet, sir, you attested under the pains and penalties of perjury that the answer that Pega was providing here was true and correct, right?***

A.     ***I did.***[44]

222.    Baril (Director, Office of the CTO) also concealed evidence of Pega's scheme during the Relevant Period by falsely testifying under oath during his September 2021 deposition in the Virginia Action.

223.    For instance, during his first deposition on September 23, 2021, Baril falsely testified he created a fake consulting firm (Andrew Powers Consulting) and its fictitious website (APowerConsulting.com) in order to "subscribe to certain journals or things that wanted personal information that I didn't want to share." 9/23/21 Baril Depo. Tr. at 67.

224.    Baril retracted that testimony during his second deposition, on January 10, 2022, ***after*** Pega produced to Appian thousands of incriminating documents it had been withholding, including damning internal chat conversations between Baril, Schuerman, and other Pega employees:

Q.     The question at line 16 [of your September 2021 deposition transcript] is: "Why did you create the domain 'apowerconsulting.com,'" correct?

A.     That is correct.

Q.     And what would you like to change your answer to?

---

[44] 4/28/22 Trial Tr. at 6454:19-6455:19.

> A.      So I would like to strike the previous answer and based on the, you know, new information that I have, my answer would be: ***To obtain access to a free Appian trial.***

1/10/22 Baril Depo. Tr. at 25.

225.    Baril also walked back testimony from September 2021 that concealed his efforts to register for an Appian account:

> Q.      The question at line 8 on 103 read: "Other than Mr. Fine and Mr. Le, are you aware of anyone else at Pegasystems that made efforts to register for any type of Appian user account?" You answered: "I am not." Would you like to change your testimony now?
>
> A.      Yes.
>
> Q.      And what would you like to change it to say?
>
> A.      The answer now would be: ***Yes, other than Mr. Fine and Mr. Le, I myself made an effort to register for an Appian user account."***

*Id.* at 30.

226.    Meanwhile, in response to the question "Are you aware of anyone at Pegasystems at taking action to get access to the Appian software platform?", Baril retracted his prior response from September 2021 – "***I'm not***" – and instead testified in January 2022: "***Yes***, I'm aware of someone – of others taking action to get access to the Appian software platform." *Id*. at 31.

227.    During his January 10, 2022 deposition, Baril also provided previously withheld details regarding his communications with Defendant Trefler:

> Q.      Do you recall having a telephone conversation in which you and Mr. Trefler were both participants? You stated: "Never." Is that the testimony you wish to change?
>
> A.      Yes.
>
> Q.      And so what is the correct answer to that question?

> A.    So it appears I have had perhaps one or two telephone conversations with Mr. Trefler that were, you know, not in large-scale meetings.

*Id*. at 33.

228.    Baril also testified on January 10, 2022 that "in addition to having meetings with Alan [Trefler] with clients, *I now recall meeting with Alan Trefler . . . one or two times independently . . . in the October to December 2019 time frame.*" *Id*. at 34-35. Baril also provided several details regarding his one-on-one meetings with Pega's CEO, including that the two met "in person in Mr. Trefler's office and another was virtually over WebEx." *Id.* at 35.

229.    Moreover, the alteration and deletion of incriminating materials by Pega employees also supports a strong inference of scienter.

230.    For instance, on or about September 10, 2019, Pega's Director of Case Management (Potluri) created an internal Pega document featuring information Potluri gathered by illicitly accessing Appian's platform using credentials he obtained from his colleague, Sarada. Potluri's document, which included links to video footage Potluri captured within Appian's platform, proposed various "ideas for . . . improving Pega's trial platform." 3/3/22 Potluri Depo. Tr. at 210-20. Potluri shared his document with Baril and colleagues in Pega's Product Management group.

231.    Potluri did not learn of the Virginia Action until speaking with Pega's in-house counsel on or about *December 1, 2021*. Within the next day or two, Potluri revisited and altered his September 10 document to add exculpatory annotations to the document.

232.    Meanwhile, Pega's Vice President of Product Development (Bixby) admitted at trial in 2022 he deleted his emails from the "time period when Mr. Petronio was bringing Zou information to [Bixby]":

> Q.  So it's just coincidence that you deleted emails in the time period

when Mr. Petronio was bringing Zou information to you, it's just a coincidence that it happened to correspond with that time period. That's your testimony?

A.   Yes.[45]

**B.     Defendants Admitted Their Scheme to Misappropriate Appian's Trade Secrets Was Inappropriate**

233.    As alleged herein, for years Pega successfully concealed its scheme to misappropriate Appian's trade secrets. Defendants' alleged misstatements and omissions publicly concealed conduct that Defendants knew – and that they themselves admitted – was inappropriate, unethical, and exposed Pega to massive financial and reputational harm. Defendants' concealment of behavior they knew was wrong supports a strong inference of scienter.

234.    For example, Schuerman admitted that Baril's use of fake names to access Appian's platform was "inappropriate." 10/1/21 Schuerman Depo. Tr. at 386. Trefler also admitted Pega's hiring of Zou was not appropriate, and Baril's use of "personas" to misappropriate Appian's trade secrets was "[n]ot appropriate":

Q. And was it appropriate?

***A. I don't think it was appropriate for him to hire Zou.***

1/12/22 Trefler Depo. Tr. at 282. Trefler further admitted:
Q. Now, you do know now, Mr. Trefler, what Mr. Baril was doing to gather information for you; correct?

A. I do now, and ***it was not appropriate***.

Q. Not appropriate?

A. ***He shouldn't have done it.***

. . .

Q. Accessing Appian as a competitor of Appian is precisely what Baril, Fine and Le were doing; correct?

---

[45] 4/19/22 Trial. Tr. at 5160:7-14.

A. Yes.

Q. Masking your identity, which is prohibited here, is precisely what Baril, Fine and Le were doing; correct?

A. Yes, and **they shouldn't have done it**.

2/1/22 Trial Tr. at 1047:9-14, 1095:2-9.

235.    Baril also questioned the "legality" of Pega's conduct in October 2019. Appian confronted Schuerman about his October 2019 response to Baril's "legality" concerns:

Q. Let's go to Line 135, sir. He writes here: **Who can I ping about the legality of using the system**? Right?

A. Yes.

Q. You were his direct supervisor at this time, right?

A. Correct.

Q. You were the chief technology officer of the company at that time, weren't you?

A. Correct.

Q. You didn't tell him to stop doing everything he was doing, did you?

A. No.

Q. **You didn't tell him to seek help from the company's chief compliance officer, did you?**

A. No.

Q. You didn't tell him that he can call the ethics hotline and get guidance, did you?

A. No.

Q. Instead let's look at Line 137. Let's take a look at what you told him. Please read that out to the members of the jury, please, your response at Line 137?

A. *How much more do you need to do/capture?*

Q. And then he tells you: I'm halfway through. Right?

A. Yes.[46]

236.    Pega employees also internally remarked that Zou's conduct was "shady," and that Pega's "arrogance has been all world." PLT 408.

237.    Bearden, one of the two whistleblowers who alerted Appian to Pega's scheme in early 2020, also admitted "*all of us [at Pega] having access to Appian documents and whatnot, obviously seemed very shady*." 9/20/21 Bearden Depo. Tr. at 245-46.

238.    Pega also often referred to Zou and Pega's employees involved in the misappropriation as its "*spy*" or "*spies*." The VUTSA – one of the acts under which Appian sought damages – specifically outlaws "espionage," which is precisely what Pega knew its "spies" perpetrated. See Va. Code §59.1-336 ("[m]isappropriation" includes "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," and "*[i]mproper means*" includes "*misrepresentation . . . or espionage through electronic or other means*").[47]

239.    The jury's conclusion that Pega acted willfully and maliciously in misappropriating Appian's trade secrets further confirms Defendants' scienter. The jury instructions delivered in the Virginia Action defined "[w]illful conduct" as "occur[ing] when a party acts without regards for the rights of another, *knowing injury will probably follow*." The jury instructions defined "[m]alicious conduct" as "occur[ing] when a party *acts with ill will or spite*." In other words, as

---

[46] 4/28/22 Trial Tr. at 6437:16-6438:25.

[47] Merriam-Webster defines "espionage" as "the practice of spying or *using spies to obtain information about the plans and activities especially of a . . . competing company*." https://www.merriam-webster.com/dictionary/espionage.

the jury concluded, Pega knew injury was likely to follow from its scheme to misappropriate Appian's information, and acted with ill will or spite in misappropriating Appian's trade secrets.

**C.     Defendants Were Motivated to Conceal from the Public the Comprehensive Injunctive Relief Appian Sought**

240.    Defendants were motivated to conceal, and did conceal, the existence of the Virginia Action, including the potentially devastating injunctive relief Appian sought until November 2021 when it withdrew its request for injunctive relief.

241.    As set forth in Appian's May 2020 Complaint, Appian sought to enjoin Pega from: (i) "***developing, marketing, selling, licensing, or using any product*** that, in any respect or to any degree, is based on, derived from, modified in response to, or incorporates any of Appian's confidential information or trade secrets"; and (ii) to "***relying [o]n any sales process on any information*** developed as a result of examining, testing, analyzing, viewing, or otherwise derived from Appian's unlawfully obtained platform or documentation."

242.    For years Pega tainted its sales processes and software with Appian's misappropriated information. Even Pega's own damages expert accepted the premise that billions of dollars' worth of Pega's revenues and profits from 4Q13 to 3Q21 were tainted by Pega's misappropriation of Appian's trade secrets.

243.    Defendants thus knew, or recklessly disregarded, that the injunctive relief Appian sought, if granted, would have prevented Pega from selling tainted software or relying on tainted sales processes, exacting a devastating financial toll on Pega.

244.    Defendants also knew, or recklessly disregarded, that the mere threat of the injunction Appian sought would adversely impact Pega's business. Additionally, Defendants knew, or recklessly disregarded, that their public disclosure of the Virginia Action could spark tremendous concerns among customers, including concerns over whether Pega's software would

be restricted or impacted by the Virginia Action, and whether another company's product (one which was not tainted by misappropriation) presented a superior alternative to Pega's.

245.    Indeed, the Virginia Action's potential impact on Pega's business was such a prominent concern at Pega that Defendants asked their outside counsel whether Pega's clients "*are, or can be, precluded from selling or using Pega software as a result of the recent jury verdict*." Defendants' outside counsel responded on May 17, 2022, stating the jury verdict "imposed . . . no such restriction" on Pega's software. Defendants knew, or recklessly disregarded, that by publicly concealing the Virginia Action (including the threatened injunction) and damning evidence of their scheme, Defendants could minimize the potential for lost business opportunities.

### D.    Defendants Intentionally Concealed from Investors Evidence of Pega's Parallel Misconduct Involving Other Software Companies

246.    Unbeknownst to investors, Pega concealed evidence of similar conduct against other competitors, including IBM, Salesforce, and ServiceNow.

247.    For instance, Pega concealed conduct it took with respect to IBM. According to a February 2, 2013 email to Pega's CTO, Leon Trefler likened Pega's scheme involving Zou to what Pega "did with IBM:" "*Just like we did with IBM/Lombardi a few months ago, we recently hired an Appian expert [Zou] to build us out a sample application so that we could see what Appian was actually like*."[48] PLT 734. Meanwhile, KForce also noted internally that "*our Lombardi guy's did well so [Pega] came back to us.*" PLT 4. Former Pega employee Petronio corroborated this evidence, admitting during his January 6, 2022 deposition that Pega sought "*very deep information*" on Pega's "top few competitors," "IBM, Appian, and Salesforce." 1/6/22 Petronio Depo. Tr. at 266. Moreover, according to counsel in the Virginia Action, Pega paid its IBM consultant tens of thousands of dollars as part of a multi-year scheme to help Pega gain illicit

---

[48] IBM acquired BPM vendor Lombardi Software in 2010.

access to IBM's platform and documentation. Additionally, Pega paid its employees bounties for obtaining its competitors' information, which included IBM's. For instance, Bessman internally circulated a presentation on IBM as "homework or proof to receive his" bonus compensation. 9/23/21 Baril Depo. Tr. at 122.

248.    Many of the same Pega employees who utilized (or condoned the use of) fake names and fake companies to access Appian's platform also secretly accessed (or condoned Pega's access to) Salesforce and ServiceNow's platforms. For instance, in 2019, Pega's CTO discussed in an email to Defendant Trefler and others a "teardown project for ServiceNow." 1/10/22 Baril Depo. Tr. at 294. Meanwhile, Baril – who concocted fakes names and a fake consulting firm to access Appian – admitted he also accessed Salesforce and ServiceNow's platforms, confessing his conduct with respect to Appian was "in line with other exercises I have done with ServiceNow and Salesforce." *Id.* at 29.

249.    Moreover, Potluri – the Pega Director of Case Management who accessed Appian's platform by assuming another's identity – testified Pega's product development employees had leveraged Pega's access to Salesforce and ServiceNow's platforms. Pega's CPO (Akgonul) also took steps to spy on Salesforce, including directing Petronio to "obtain screenshots of the Appian and Salesforce security process." 1/5/22 Akgonul Depo. Tr. at 559. Finally, Fine – the Pega Solutions Consulting Manager who used his spouse's business as a front to illicitly obtain Appian credentials – also accessed Salesforce's platform.

250.    Defendants knew, or recklessly disregarded, that Pega's similar conduct against other software companies was inappropriate, unethical, and potentially illegal. Defendants also knew, or recklessly disregarded, that Pega's parallel schemes could – if publicly revealed – expose Pega to additional financial and reputational harm. Defendants were therefore motivated to

conceal, and did conceal from investors, evidence of Pega's parallel schemes, which further supports a strong inference of scienter.

    **E.**    **Defendants' Scheme Involved a Primary Competitor of Pega's**

    251.    The fact that Defendants' material misstatements and omissions concerned Appian, a primary competitor of Pega's in the BPM market, supports a strong inference of scienter.

    252.    Pega considered Appian one if its primary competitors in the intensely competitive BPM market. For instance, in an April 23, 2013 email, Kim described Appian as one of Pega's "top 3 competitors." PLT 720. Petronio similarly testified Pega's "top few competitors" were "IBM, Appian, and Salesforce." 1/6/22 Petronio Depo. Tr. at 266.

    253.    During the Relevant Period, Pega also identified Appian as a key competitor of Pega. For example:

- During the November 16, 2021 RBC Capital Markets Global Technology, Internet, Media and Telecommunications Conference, Stillwell explained: "So that's kind of the way I think about the market. There's kind of ones that are very like-for-like with us, which is Salesforce, ServiceNow, Microsoft and even, to some extent, Appian, in a little bit in – certainly in the back office way."

- During the November 30, 2021 Credit Suisse Technology, Media & Telecom Conference, Stillwell further explained: "So we kind of have those 3 layers. One is the CRM incumbents, the big major players, they're right. We compete with them all the time. The digital process automation is some of those same ones, but also some of the core low-code providers but more like a ServiceNow or an Appian and Mendix or an OutSystems."

    254.    Appian likewise identified Pega as one of its predominant competitors. For instance:

- During the May 29, 2019 Cowen Technology, Media & Telecom Conference, Appian's CFO stated "the ***number one competitor out there for us is Pegasystems.***"

- During the March 1, 2021 Morgan Stanley Technology, Media and Telecom Conference, Appian's CEO stated: "So our traditional long-term competitors, Pegasystems, we've been competing with them for more than a decade. And ***so we still see them more frequently than any of the other companies*** that you mentioned in our competitions."

- During the December 7, 2021 Barclays Global Technology, Media and Telecommunications Conference, Appian's CFO stated: "We see Pega twice as often as any other vendor."

- During the August 8, 2022 KeyBanc Capital Market Technology Leadership Forum, Appian's CFO stated "***Pega is our predominant competitor in terms of who we see most often. They are probably twice as often as everybody else***."

255.    Similarly, industry analysts recognized Appian as a key competitor of Pega. For example, citing Gartner (a large industry analyst that focused on the tech space, including the BPM market), J.P. Morgan identified Pega and Appian as "leaders" in the business process management and automation space, noting 43% of Pega's customers considered Appian prior to selecting Pega. J.P. Morgan also stated that "[a]mong the low-code application development platforms, Pega competes the most with Salesforce followed by Appian," and that "Appian is probably the closest pure-play competitor to Pegasystems." Another analyst, Benchmark, stated in late 2020: "[T]he competitive landscape [for Pegasystems] is little changed – principal competitors are still salesforce.com in CRM and IBM and Appian in DPA (formerly referred to as BPM)." CFRA concurred in mid-2021, calling Appian "PEGA's closest peer."

256.    The fact that Pega (including its CEO, Founder, and Chairman) engaged in such egregious corporate espionage against Appian is illustrative of the significant competitive threat Appian posed to Pega. Indeed, as Pega employee Baril admitted on October 4, 2019, Defendant Trefler was intent on eliminating Appian as a competitive threat: "Alan [Trefler] and [his brother] Leon [Trefler] are ***very focused on destroying Appian***. Like making it go away for good." PLT 649.

257.    The fact that Appian and Pega pursued the same customers and deals year after year further illustrates the competitive threat Appian posed to Pega. For instance, Appian presented evidence that Pega had won 201 opportunities between 4Q13 and 3Q21 for which it directly

competed against Appian. Pega's own counsel also stated at trial that "Pegasystems and Appian .

. . competed for a significant number of customers and a significant number of opportunities."

5/2/22 Trial Tr. at 7095:4-9.

## VIII.   LOSS CAUSATION

258.    During the Relevant Period, as detailed herein, Defendants made false and
misleading statements and/or omitted material information and engaged in a scheme to deceive the
market. By artificially inflating and manipulating Pega's stock price, Defendants deceived
Plaintiffs and caused them losses when the relevant truth was revealed. When Defendants' prior
misrepresentations and fraudulent conduct became apparent to the market, it caused Pega's stock
price to fall precipitously as the prior artificial inflation came out of the stock price. As a result of
its purchase and holding (instead of selling) of Pega stock during the Relevant Period, Plaintiffs
suffered economic loss and damages under the federal securities laws.

259.    On February 16, 2022, after the market closed, Pega filed its 2021 10-K disclosing
the existence of the Virginia Action as well as that Appian was seeking approximately $3 billion
in damages for Pega's misappropriation of Appian's trade secrets. Following Pega's
announcement, Pega's stock price dropped approximately 15.62% on February 17, 2022, the next
trading day, down $15.24 from the closing price on February 16.[49] However, Defendants continued
their fraud and limited Pega's stock price decline by, *inter alia*, misleadingly assuring investors
that Appian's claims were "without merit," Pega had "strong defenses to these claims," and "any
alleged damages" were unsupported.

260.    On March 21, 2022, trial commenced in the Virginia action. The prior trading day,

---

[49] In contrast, on February 17, 2022, the NASDAQ was only down around 2.9% while the Standard
& Poor's North American Technology Sector - Software Index (the "S&P Software Index") was
only down around 4.7%.

ootball

March 18, 2022, Pega stock closed at $79.57. From March 21, 2022, information regarding Pega's misconduct leaked into the marketplace in the form of trial testimony in the Virginia trial. By the day before the verdict, May 9, 2022, Pega stock closed at $65.93.

261.    The fall in Pega stock from March 21, 2022, to May 9, 2022, was caused by the leaking of information regarding Defendants' fraud into the marketplace. The method of dissemination, trial testimony, resulted in a slower and more dispersed delivery of information, and the limited forum for dissemination, specifically, a Virginia trial court courtroom, meant that the information entered the marketplace only slowly with impact on Pega's value over time. The leaking of information into the marketplace would not be expected to create a single day statistically significant corrective event. The movement in Pega stock over the two-month period described was significant in the aggregate.

262.    After the market closed on May 9, 2022, Pega filed a report on Form 8-K announcing the jury in the Virginia Action had rendered a unanimous verdict against Pega, finding it had violated the VUTSA and VCCA, awarding Appian damages and entitling Appian to recover attorney's fees and other relief.[50] On this news, Pega's stock price closed at $52.25 on May 10, 2022, down $13.68 per share (or over 20%) from its closing price of $65.93 per share on May 9, 2022. Pega's stock price dropped another $4.18 per share on May 11, 2022 (or 8.0% from the previous trading day's closing price) as the market continued to absorb Pega's disclosure.[51]

263.    Analysts linked Pega's tremendous stock price decline to the news about the Virginia Action. For instance, Wedbush analysts noted on May 10, 2022 the "~35% cut to [Pega's]

---

[50] On or about June 8, 2022, Appian filed a motion seeking approximately $22.6 million in attorney's fees, approximately $4.2 million in costs, and post-judgment interest at the rate of 6% per annum.

[51] In contrast, the NASDAQ closed up around 1% and down around 3.2% on May 10 and 11, respectively, while the S&P Software Index closed up 1.5% and down 3.8% on May 10 and 11, respectively.

shares as the Street is reading this ruling as cemented," adding "this news adds risk and uncertainty to the stock in the near term." That same day, William Blair reported "the "***verdict could cause reputational harm to Pegasystems" and partners to "shift[] PEGA resources over to Appian's platform,***" while RBC Capital Markets noted the verdict "***will be a blot on Pega's record when*** dealing with federal contracts as the company will likely have to disclose its violation of the Virginia Computer Crimes Act."

264.    Morningstar announced on May 11, 2022, it was slashing its price target "for Pegasystems to $104 per share, from $120," explaining "***investor confidence in Pegasystems is shaken***" by this news, which "go beyond mere potential governance concerns." Analyst firm Truist announced the same day it was downgrading Pega due to the "$2.04+ billion dollar overhang" and "***potential ACV [Annual Contract Value] growth headwinds as a result of the lawsuit decision***," noting "PEGA will have to disclose its violation of the Virginia Computer Crimes Act on future federal contracts bid on by the company," which "***could potentially cause a material headwind to ACV growth in this vertical moving forward***." Morgan Stanley echoed this sentiment on May 11, 2022, stating "***Appian may now have a[n] edge versus Pegasystems for future government contracts, given the damage to Pegasystems' record***."

265.    On July 28, 2022, during market hours, the Judge in the Virginia Action denied Pega's motion for a judicial investigation of juror conduct in the underlying action. Pega stock fell in response. Having closed at $47.55 on July 27, 2022, Pega stock declined to close at $40.24 on July 28, 2022, a decline of over 15%.

266.    Before the market opened on September 16, 2022, Pega filed a Form 8-K announcing the court in the Virginia Action had entered judgment in favor of Appian. Pursuant to the judgment, Pega was ordered to pay Appian $2,036,860,045 in damages, post judgment interest

on Appian's damages at the annual rate of 6% (accruing from May 9, 2022), attorney's fees in the amount of $23,615,461.34, and costs in the amount of $3,780.07, plus post judgment interest on the attorney's fees and costs at the annual rate of 6%, accruing from the date of judgment. The court also entered judgment against Zou in the sum of $5,000, plus 6% annual interest accruing from May 9, 2022. Pega's stock declined 5.93% (or $2.39 per share) on September 16, 2022 from the previous trading day's closing price, and again on September 19, 2022 by 5.99% (or $2.27 per share), as investors and analysts reacted to the news that the jury's May 9, 2022 verdict (including its findings on liability and damages) was not vacated.

267.    For instance, JMP analysts noted on September 16 that "the final judgment is a *clear negative for Pega and is a step in the wrong direction* in terms of Pega achieving a positive outcome in this lawsuit," adding "as a result of the judgment, Pega may have to pay Appian statutory post-judgment interest on the judgment at an annual rate of 6%, or ~$122M per year, which is incremental, in our view." JMP further noted it would "remain on the sidelines given the substantial ~$2.04B in damages (plus attorney's fees and costs) the company may be required to pay Appian . . . the potential reputational and financial risk to the company, *particularly if clients decide to re-evaluate their Pega investments*, and that management will likely be spending a fair amount of time and energy on resolving this matter." JMP also slashed its non- GAAP earnings per share estimates for fiscal years 2022 through 2024, remarking "as a result of this ruling, when Pegasystems bids on any federal contracts in the future, it may have to disclose during the process that it violated a state law" which "*could have an impact [on] its federal business.*"

268.    The significant declines in Pega's stock price identified above were a direct result of the nature and extent of Defendants' fraudulent misrepresentations and omissions being revealed to investors and the market. The timing and magnitude of the decline in the price of Pega's

stock, particularly when compared to the movements of the NASDAQ stock index and the S&P Software Index, as noted above, negate any inference that the loss suffered by Plaintiff was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss and damages suffered by Plaintiff were a direct result of Defendants' fraudulent scheme to artificially inflate the price of Pega stock and the subsequent significant decline in the price of Pega stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

269.   With respect to Plaintiffs' common law fraud claims, Plaintiffs were damaged by their purchase of Pega common stock at inflated prices, regardless of when or in what manner the fraud was revealed. Plaintiffs paid inflated prices for Pega common stock and would not have purchased Pega common stock at that price had the full truth been known to them at the time of purchase.

270.   With respect to Plaintiffs' common law fraud claims based upon holding Pega common stock, Plaintiffs were damaged by their holding of Pega common stock. Plaintiffs would have sold their holdings of Pega common stock had the full truth been made known to them and would have avoided further losses

## IX.   PLAINTIFFS' ACTUAL RELIANCE

271.   At all times during the relevant period, Plaintiffs were managed by Eminence Capital, LP, a New York based investment manager.

272.   Plaintiffs, through Eminence Capital, LP, actually read or heard, reviewed, and justifiably relied on the representations set forth above prior to purchasing Pega common stock on the dates they did to the extent each such statement had been made at the time of purchase.

273.   Analysts at Eminence Capital LP habitually read SEC filings, attended earnings calls, reviewed press releases, and otherwise reviewed and relied on issuers' public disclosures.

274.    Prior to purchasing Pega common stock on behalf of Plaintiffs, an analyst at Eminence Capital, LP would have actually read or heard, reviewed, and justifiably relied on Pega's SEC filings as well as Defendants' other public disclosures in determining whether to purchase, or recommend purchasing, Pega common stock.

275.    As Eminence Capital, LP continued to purchase Pega common stock on behalf of Plaintiffs, an analyst at Eminence Capital, LP would have kept abreast of publicly disclosed developments concerning Pega. This practice would have included reading SEC filings, attending earnings calls, and reviewing Defendants' other public disclosures.

276.    Defendants' public disclosures were material to Eminence Capital LP's decision to purchase Pega common stock on behalf of Plaintiffs.

277.    Had Eminence Capital, LP known the truth, it would not have caused Plaintiffs to purchase Pega common stock or, if it had done so, would not have caused Plaintiffs to purchase at the prices they did.

## X.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE

278.    At all relevant times, the market for Pega common stock was an efficient market for the following reasons, among others:

(a)    Pega stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient market;

(b)    According to the Company's Form 10-Q filed July 27, 2022, Pega had more than 81 million shares of common stock outstanding as of July 19, 2022;

(c)    As a regulated issuer, Pega filed periodic public reports with the SEC;

(d)    Pega regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e)    Unexpected material news about Pega was rapidly reflected in and incorporated into the price of Pega common stock during the Relevant Period.

279.    As a result of the foregoing, the market for Pega common stock promptly digested public information regarding Pega and reflected such information in the price of Pega common stock. Under these circumstances, all purchasers of Pega common stock during the Relevant Period suffered similar injury through their purchases of Pegasystems common stock at artificially inflated prices, and a presumption of reliance applies.

280.    A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Plaintiff's claims are based, in significant part, on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Pega's business, operations, liabilities, and risks, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.    CAUSES OF ACTION

**COUNT I**
**Violations of §10(b) of the 1934 Act**
**and SEC Rule 10b-5(b) Against All Defendants**

281.    Plaintiff repeats and realleges every allegation contained above as if set forth herein.

282.    During the Relevant Period, Defendants Pega, Trefler, and Stillwell disseminated or approved the statements specified above, which they knew or recklessly disregarded contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

283.    The Defendants violated §10(b) of the 1934 Act and SEC Rule 10b-5(b) in that the made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

284.    Defendants, individually and together, directly and indirectly, by the use, means of instrumentalities of interstate commerce, and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about Pega's business, operations, and financial condition as specified herein.

285.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.

286.    As a result of the dissemination of the materially false or misleading information and/or failure to disclose material facts, as set forth above, the market price of Pega common stock was artificially inflated during the Relevant Period. In ignorance of the fact that the market price of the Company's common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the Company's common stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants (but not disclosed in Defendants' public statements during the Relevant Period), Plaintiffs purchased or otherwise acquired Pega common stock during the Relevant Period at artificially high prices and were damaged thereby.

287.    Plaintiffs, in reliance on the integrity of the market, paid artificially inflated prices for Pega common stock and suffered losses when the relevant truth was revealed. Plaintiffs would not have purchased Pega common stock at the prices paid, or at all, if Plaintiffs had been aware that the market prices had been artificially and falsely inflated by these Defendants' misleading

statements.

288.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs

suffered damages in connection with their Relevant Period transactions in Pega common stock.

289.    Taking into account, *inter alia,* tolling of the limitations period by the filing of the

class action complaints against Defendants in the Class Action, Plaintiffs have brought this claim

within two years of discovery of the violations alleged herein, and within five years of the

violations alleged herein. Consequently, this action is timely.

**<u>COUNT II</u>**
**Violations of §10(b) of the 1934 Act**
**and SEC Rule 10b-5(a) and (c) Against All Defendants**

290.    Plaintiff repeats and re-alleges each and every allegation contained in each of the

foregoing paragraphs as if fully set forth herein.

291.    This cause of action is brought against Defendants for violations of Section 10(b)

of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5(b)(a) and (c) promulgated thereunder, 17

C.F.R. § 240.10b-5.

292.    The Defendants violated §10(b) of the 1934 Act and SEC Rule 10b-5(a) and (c) in

that they: employed devices, schemes, and artifices to defraud; and engaged in acts, practices, and

a course of business that operated as a fraud or deceit upon Plaintiffs in connection with Plaintiffs'

purchases of Pega common stock during the Relevant Period.

293.    Defendants carried out a common plan, scheme, and unlawful course of conduct

that was intended to, and did: (i) deceive the investing public, including Plaintiffs; (ii) artificially

inflate the price of Pega common stock; and (iii) cause Plaintiffs to purchase Pega common stock

at artificially inflated prices.

294.    In furtherance of this unlawful plan, scheme and course of conduct, Defendants

employed devices, schemes and artifices to defraud, and knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs in connection with its purchases of Pega common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

295.    Defendants' fraudulent devices, schemes, artifices, and deceptive acts, practices, and course of business included the knowing or reckless suppression and concealment of information regarding: (i) that a core pillar of Pega's business strategy was to misappropriate Appian's trade secrets; (ii) the massive potential liabilities associated with such strategy or; (iii) that those liabilities may be imminently realized in the Virginia Action.

296.    Plaintiffs reasonably relied upon the integrity of the market in which Pega's common stock traded.

297.    At the time of Defendants' scheme and unlawful course of conduct alleged herein, Plaintiffs were unaware of the fraudulent scheme and unlawful course of conduct and/or the impact of the fraudulent scheme. Had Plaintiffs known the true extent of Defendants' fraudulent scheme and unlawful course of conduct, Plaintiffs would not have purchased Pega's common stock, or if they had purchased such common stock, they would not have done so at the artificially inflated prices that they paid.

298.    As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Plaintiffs suffered damages in connection with their purchases of Pega's common stock.

299.    Taking into account, *inter alia,* tolling of the limitations period by the filing of the class action complaints against Defendants in the Class Action, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the

violations alleged herein. Consequently, this action is timely.

## COUNT III
### Violations of §20(a) of the 1934 Act
### Against the Individual Defendants

300.    Plaintiff repeats and realleges every allegation contained above as if set forth herein.

301.    During the Relevant Period, the Individual Defendants acted as controlling persons of Pega within the meaning of §20(a) of the 1934 Act.

302.    As founder, CEO, and Chairman of Pega since 1983, Defendant Trefler exerted a tremendous amount of power over the Company. For instance, as the Company's 2020 Proxy Statement stated, Defendant Trefler exercised "a strong vision and voice for leading and representing Pegasystems to others." Pega's CTO, Schuerman, echoed this sentiment at trial in the Virginia Action, testifying that Trefler was the person he looked to for leadership. The 2020 Proxy Statement further stated that Trefler was responsible, along with other senior management, including Defendant Stillwell, for setting yearly strategic goals for the Company. He also played a key role in setting executive compensation, "assess[ing] each executive officer's contribution to the overall operational plan and to such executive officer's specific functional unit," which assessment was then used for the purposes of awarding yearly performance-based executive compensation. Further, as the 2020 Proxy Statement asserted, as the founder "guid[ing] [the Company] during more than three decades of growth," Trefler was "most familiar with our operations."

303.    In addition, Trefler owned approximately 49%-50% of Pega's outstanding common shares leading up to and during the Relevant Period

304.    The Company itself acknowledged the substantial power wielded by Defendant

Trefler due to the number of Pega shares that he owned. For example, Pega's 2019 10-K reads:

> As of December 31, 2019, our Chief Executive Officer beneficially owned approximately 50% of our outstanding shares of common stock. As a result, he has the ability to exert significant influence over all matters submitted to our shareholders for approval, including the election and removal of directors and any merger, consolidation, or sale of our assets. This concentration of ownership may delay or prevent a change in control, impede a merger, consolidation, takeover, or other business combination involving us, discourage a potential acquirer from making a tender offer or otherwise attempting to obtain control of us, or result in actions that may be opposed by other shareholders.

305. Pega made substantially the same disclosure in its 2020 and 2021 10-Ks, during which Trefler's percentage ownership was 49%.

306. As COO and CFO, Defendant Stillwell played an expansive role at Pega on both the financial and operational side of the business. For example, during Pega's 3Q20 earnings call on October 28, 2020, Defendant Stillwell told investors he is "very close to the deals at Pega, probably even more so than most CFOs because of the – some of the functions that report in to me, but I'm very close to deals."

307. The Individual Defendants also signed SEC filings during the Relevant Period, including SOX Certifications in connection with these filings attesting to their accuracy, and thus were responsible for the content and dissemination of these materials, including the false and misleading statements therein. Of course, the Individual Defendants themselves made numerous false and misleading statements during industry or earnings conference calls identified above, and thus had the ability to prevent these statements from being made or cause the statements to be corrected.

308. By virtue of their high-level positions, participation in and awareness of the Company's operations, intimate knowledge of Pega's publicly-issued statements, and facts alleged

above, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the allegedly false and misleading statements giving rise to the securities violations as alleged in Count I.

309.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs suffered damages in connection with Plaintiffs' purchases and acquisitions of the Company's common stock during the Relevant Period when the relevant truth was revealed.

310.    Taking into account, *inter alia,* tolling of the limitations period by the filing of the class action complaints against Defendants in the Class Action, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this action is timely.

<u>**COUNT IV**</u>
**Common Law Fraud**
**Against All Defendants**

311.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

312.    Defendants made untrue statements of material facts, and omitted to state material facts necessary to make their statements not misleading, to induce Plaintiffs to purchase Pega common stock or hold that stock. Specifically, Defendants' false and misleading statements and omissions included: (i) statements touting Pega's competition and sales and marketing practices, while failing to disclose, *inter alia*, it was relying on corporate espionage to gain a competitive advantage; (ii) statements concerning Pega's competitors' intellectual property rights and that infringement claims by unnamed competitors might arise at some indeterminate point, while concealing, *inter alia*, Pega's egregious scheme to misappropriate Appian's trade secrets, the

massive potential liability arising therefrom, and, indeed, the existence of the Virginia Action; (iii) statements that Appian's claims lacked merit, while failing to disclose, *inter alia,* Appian's liability and damages claims were well-supported; (iv) statements regarding Pega's Code and ethical practices, which failed to disclose, *inter alia*, Pega's egregious corporate espionage and flagrant violations of Pega's own guidelines; and (v) statements concerning Defendants' compliance with the federal securities laws, which failed to disclose that, *inter alia*, Pega's Forms 10-K and 10-Q were materially misleading and contained false financial statements.

313.    Defendants knew that their statements were false when made or omitted material facts or, at the very least, made the statements with reckless disregard for their truth.

314.    Defendants knew that investors like Plaintiffs would review and rely on such misrepresentations and intended that their false and misleading statements and omissions would induce Plaintiffs to purchase or hold Pega common stock at inflated prices.

315.    These statements were material to Plaintiffs, and Plaintiffs actually, reasonably, and justifiably relied on them when purchasing Pega common stock and while continuing to hold Pega common stock instead of selling it. At the time of the material misrepresentations alleged herein, Plaintiffs were ignorant of their falsity, and believed them to be true. Had Plaintiffs known the truth with respect to the statements, including, *inter alia*, (i) that a core pillar of Pega's business strategy was to misappropriate Appian's trade secrets, (ii) the massive potential liabilities associated with such strategy or, (iii) that those liabilities may be imminently realized in the Virginia Action, then Plaintiffs would not have purchased Pega common stock, or if Plaintiffs had purchased such common stock, Plaintiffs would not have done so at the artificially inflated prices that it paid. Nor would Plaintiffs have held Pega common stock, and instead would have sold the stock, had Plaintiffs known the true facts as described herein.

316.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages in connection with their transactions in and holding of Pega common stock, as described above and to be proven at trial.

317.   Defendants' wrongful conduct, as described above, was fraudulent, malicious, reckless, willful, and was directed at the general investing public. Accordingly, punitive damages, in addition to compensatory damages, are appropriate to deter fraudulent conduct of this kind.

## COUNT V
## Common Law Negligent Misrepresentation
## Against All Defendants

318.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

319.   Defendants authorized or caused the representations and omissions set forth above.

320.   Defendants intended to supply false information for Plaintiffs to use in making investment decisions and intended for the false information to be used by Plaintiffs when making investment decisions.

321.   Defendants had no reasonable grounds for believing their representations were true when made or, at the very least, knew that their representations were materially misleading.

322.   Defendants had a duty to exercise reasonable care and competence in providing information about, *inter alia*: (i) that a core pillar of Pega's business strategy was to misappropriate Appian's trade secrets; (ii) the massive potential liabilities associated with such strategy or; (iii) that those liabilities may be imminently realized in the Virginia Action.

323.   Defendants made misrepresentations that they knew, or should have known, to be false or misleading in order to induce investors, including Plaintiff, to purchase Pega common stock.

324.     Defendants breached their duty to exercise reasonable care in making these representations to Plaintiffs.

325.     Plaintiffs reasonably and justifiably relied on such misrepresentations. But for Defendants' misrepresentations, Plaintiffs would not have purchased Pega common stock, or if it had purchased such common stock, Plaintiffs would not have done so at the artificially inflated prices that they paid.

326.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages in connection with their transactions in and holding of Pega common stock, as described above and to be proven at trial.

## XII.    REQUEST FOR RELIEF

Plaintiffs request that this Court enter judgment as follows:

(a)     Award compensatory damages in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(b)     Award punitive damages, in an amount to be determined at trial,

(c)     Award Plaintiffs reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Award such other relief as the Court may deem just and proper.

## XIII.   JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues so triable.

DATED: December 4, 2024

EMINENCE FUND LONG MASTER, LTD.,
EMINENCE FUND MASTER, LTD., EMINENCE
FUND II MASTER, LP, EMINENCE PARTNERS
LONG II, LP, EMINENCE FUND LEVERAGED
MASTER, LTD., EMINENCE PARTNERS, L.P.,
and EMINENCE PARTNERS II, L.P.,

By their attorneys,

 /s/ Joshua M. D. Segal
Joshua M. D. Segal (BBO No. 678367)
LAWSON & WEITZEN, LLP
88 Black Falcon Avenue, Suite 345
Boston, MA 02210
Telephone: (617) 439-4990 x3081
Fax: (617) 439-3987
Email:  jsegal@lawson-weitzen.com

Lawrence Rolnick (pro hac vice forthcoming)
Marc B. Kramer (pro hac vice forthcoming)
Richard A. Bodnar (pro hac vice forthcoming)
ROLNICK KRAMER SADIGHI LLP
1 Pennsylvania Plaza
New York, NY 10119
Telephone: 212.597.2800
Fax: 212.597.2801
Email: lrolnick@rksllp.com
Email: mkramer@rksllp.com
Email: rbodnar@rksllp.com